No. 47,904

W<small>ILLIAM</small> W. D<small>ODSON</small> and N<small>ORMA</small> L<small>OU</small> D<small>ODSON</small>, *Appellants,* v. C<small>ITY</small> <small>OF</small> U<small>LYSSES</small>, a municipal corporation, *Appellee.*

(549 P. 2d 430)

Opinion filed April 10, 1976.

*Ted F. Fay, Jr.,* of Hugoton, argued the cause, and *B. E. Nordling* and *Leland E. Nordling,* of Hugoton, were with him on the brief for the appellants.

*William B. Bolin,* of Garden City, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

FOTH, C.: This is an action to enjoin a special assessment of $10,670.40 against plaintiffs' land for street improvements made by the city of Ulysses. The trial court declined to enjoin the assessment and the plaintiff landowners have appealed. Their basic complaints go to lack of notice of the city's intention to make the improvement or to levy the assessment, and to the procedure employed in determining the amounts to be levied. The city has cross-appealed from a portion of the judgment relating to the cost of paving two intersections.

The plaintiffs, Dr. and Mrs. William W. Dodson, own an unplatted piece of land at the edge of Ulysses, bounded on the south by Maize street and on the north by Patterson. Their land extends something over 600 feet north-south. On the west is Missouri street, from which the Dodson land extends east 1230 feet to the city limits and an undetermined distance beyond. Their home faces Missouri and sits back some 300 feet from it. Ten acres of the land are devoted to the house, outbuildings and lawn, the balance to pasture for Dr. Dodson's horses.

The improvement in question was the paving, curbing and guttering of Maize street from the east edge of Missouri two blocks eastward along the south edge of plaintiffs' property, for a total

distance of 1140 feet. Within this stretch two streets, Arapahoe and Cheyenne, run into Maize from the platted land to the south and form "T" intersections where they encounter the Dodsons' unplatted land. (These are the intersections involved in the city's cross-appeal.)

The improvement, one of several paving projects including several blocks, was made under the general paving law, K. S. A. 12-601 *et seq.* As required by K. S. A. 12-602 a resolution declaring the work necessary was published in the official city paper for two consecutive weeks (on July 15 and July 22, 1971). No other notice was given of the proposed improvement to any affected property owner, including the Dodsons, and none is required by statute. When no protests were received within the statutory twenty days the city passed an ordinance ordering the work done and proceeded with the improvement. Dr. Dodson, watching the work in progress, pointed out to the workmen where to make driveway cuts in the curb along his property in four places.

Plaintiffs' first and primary claim is that they were denied due process of law when they were given no notice of the city's intention to make the improvement other than the statutory publication notice. In support they cite *Mullane v. Central Hanover Tr. Co.*, 339 U. S. 306, 94 L. Ed. 865, 70 S. Ct. 652; *Walker v. Hutchinson City*, 352 U. S. 112, 1 L. Ed. 2d 178, 77 S. Ct. 200; *Pierce v. Board of County Commissioners*, 200 Kan. 74, 434 P. 2d 858; and *Chapin v. Aylward*, 204 Kan. 448, 464 P. 2d 177. All those cases stand for the proposition that publication notice alone is constitutionally insufficient when proceedings may directly and adversely affect a party's rights and his whereabouts are known or easily ascertainable. Under those circumstances some other form of notice, reasonably calculated to inform the party, is required to conform with the requirements of due process.

Plaintiffs urge that doctrine is applicable here because, according to Dr. Dodson's testimony, they owned enough of the property subject to assessment to block the improvement through a statutory protest. Had they known they had such a right, they say, they would have filed such a protest.

We may concede that plaintiffs' position has much to commend it as a matter of public policy. The legislature might well have provided, as a matter of fair play, that persons with a right to protest be given personal notice of that right. The statute, however, does not require it, and so far as we are able to ascertain it is

universally held that the constitution doesn't either. The leading case is *Utley v. St. Petersburg*, 292 U. S. 106, 78 L. Ed. 1155, 54 S. Ct. 593 (1933). In that case the landowners sought to enjoin a paving assessment against their property because they had been afforded no opportunity to be heard in opposition to the initiation of the improvement. The contention, it was held, presented no substantial federal question. Justice Cardozo, speaking for a unanimous court, observed:

". . . There is no constitutional privilege to be heard in opposition at the launching of a project which may end in an assessment. It is enough that a hearing is permitted before the imposition of the assessment as a charge upon the land. . . ." (292 U. S. at 109.)

*Utley* was relied on in *Jones v. Village of Farnam*, 174 Neb. 704, 119 N. W. 2d 157, where the applicable statute required only publication notice of the meeting at which a sewer district was to be established. Even though landowners subject to assessment were given the statutory right to block the formation of the district by protest, it was held that personal notice of the meeting was not constitutionally required. Due process was satisfied in that the landowners would get notice of and have a right to be heard on the amount of any assessment.

A similar result was reached in *Brown v. City of Salem*, 251 Or. 150, 444 P. 2d 936. Again the applicable legislation required, and plaintiff received, only publication notice of the city's intent to pave a street. Plaintiff, like the plaintiffs here, owned enough of the land subject to assessment to block the improvement by legal protest. It was held that there was no due process violation; *Utley* controlled, not the *Mullane-Walker* line of cases.

Similarly, in *Fisher v. City of Minot*, 188 N. W. 2d 745 (N. Dak. 1971), the plaintiff landowners complained that they received no personal notice of the city's intent to create a parking lot district in which their land would be assessed. The only notice given was by publication. The North Dakota court, like the Nebraska and Oregon courts, found the *Mullane-Walker* doctrine inapplicable at the initiation stage of a public works. It held ". . . at this stage . . . the personal rights or the property rights of [plaintiffs] have not been in any way jeopardized, nor have they been deprived of any constitutional rights." (188 N. W. 2d at 751.)

Plaintiffs cite us no cases to the contrary, nor have we been able to find any. The rationale of the cases is that the mere making of a public improvement does not "deprive any person of . . .

property." (U. S. Const., Amend. XIV, § 1.) Although an assessment will or may be levied at a later time, even then, if the assessment is properly apportioned according to the benefits to the property, "it or its owner suffers no pecuniary loss thereby since the property is increased in value by an amount at least equal to the sum it is required to pay." (*Davies v. City of Lawrence,* 218 Kan. 551, 545 P. 2d 1115, Syl. ¶ 2.) At the time the improvement is ordered it is presumed that any later assessment will be fair. Since there is no deprivation of property by the mere making of the improvement, notice is not constitutionally required at that stage.

Of course, at the time the amount of the assessment is determined the landowner has a distinct interest in seeing that his property bears no more than its fair share of the cost. This is a constitutionally protected property interest, and the strictures of due process are applicable. *Wisconsin Electric Power Co. v. Milwaukee,* 352 U. S. 948, 1 L. Ed. 2d 241, 77 S. Ct. 324.

The Dodsons' complaint on this issue is that they received no personal notice in advance of the meeting at which the city council considered objections to the proposed assessments and passed the assessment ordinance. Notice of the meeting was given by publication on April 11, 1974, and the meeting was held on April 17, 1974. The ordinance enacted was published April 25, 1974, and the same day the city clerk mailed a postcard to each affected property owner setting forth the amount of his or her assessment. In this respect there was strict compliance with the statute (K. S. A. 12-608). The Dodsons received their notice and promptly filed this suit.

The identical contention made by the plaintiffs here was met and decided adversely to their position in *Newson v. City of Wichita,* 186 Kan. 444, 351 P. 2d 10. That case also involved an assessment under 12-608, and the landowners cited *Mullane* and *Walker* for their contention that they were entitled to personal notice of the assessment meeting, despite the lack of such a requirement in the statute. After discussing the authorities cited the court noted:

". . . On the facts in the instant case the provisions of 12-608, *supra,* authorized the appellees [landowners] to bring a suit to set aside the special assessments within thirty days after the publication of the ordinance fixing the assessments, and the appellees brought the instant action within the thirty-day requirement by reason of having received a notice by mail from the city clerk of the ordinance fixing the assessments, in addition to the required publication notice. At the hearing before the trial court in this action the appellees had the right to be heard on any matters concerning which they felt aggrieved, including the question of whether their respective lots or pieces of land had been appraised too high or too low." (186 Kan. at 453.)

The court then referred to numerous authorities for the proposition that notice is adequate if it affords a reasonable opportunity to be heard before any "taking" of property, and that the right to judicial review before the assessment becomes final constitutes such an opportunity to be heard. The court concluded:

"We therefore hold under the foregoing authorities that the appellees were not denied due process of law under the Fourteenth Amendment to the Federal Constitution. The appellees had adequate notice pursuant to which they brought the instant action which enabled them to be heard in a court of law and fully present their grievances." (*Id.* at 454.)

The plaintiffs would have us overrule *Newson,* urging that notice to a property owner only after the amount of the assessment is determined by the governing body gives him far less of a right to be heard than notice beforehand. Actual notice of the council meeting, they say, would permit the owner to plead his own cause in the political forum, rather than perforce rely on a hired advocate in the judicial forum. It would also permit the owner's argument to be made at a time when the issue is still open, rather than when a presumption of regularity has attached to the city's determination. (See, *e. g., Strickland v. City of Wichita,* 203 Kan. 954, 457 P. 2d 162.) While there is much to commend this position, we again believe the argument should be addressed to the legislature. The courts are open to the aggrieved landowner, and we are not convinced that the judicial remedy is so inadequate that one forced to resort to them is denied due process of law.

Plaintiffs' third complaint is that the city wholly ignored the statutory method of arriving at the amount of their assessment. On this score we must agree with them.

K. S. A. 12-608 provides that the amount to be assessed against each benefitted parcel "shall be determined by the assessed value of the lots and pieces of land without regard to the buildings or improvements thereon." The "assessed value" of each for these purposes is to be ascertained by three specially appointed appraisers. When they return their appraisal the governing body is to hold "a special session to hear any complaint that may be made as to the *valuation* of any lot or piece of land appraised as aforesaid." (Emphasis added.) At the special meeting the governing body "may alter the *valuation* of any lot or piece of land, if in their opinion the same has been appraised too high or too low." (Emphasis added.)

The basis for assessment under the statute is clearly the appraised

*value* of each piece of land to be assessed; hence it is the appraised values that are in issue at the special meeting, and not the amount of the ultimate assessments. Once the total appraised value of all land liable for assessment is determined, determining each assessment is a matter of simple mathematics. Either the ratio of total appraised value to total cost, or the ratio of each lot's appraised value to the total appraised value, will achieve the correct result.

Here appraisers were appointed, but that was the last step taken by the city to comply with the procedures prescribed by the statute. Appraisal figures were set down on a so-called appraisers' report, but these were taken from the tax assessment roll in the county clerk's office—the appraisers never attempted to view any of the property. As a result, the figure adopted for plaintiffs' property was the tax assessment figure for the entire property—presumably including that which extended east on Maize beyond the improvement and even beyond the city limits, and certainly including that which was more than the 300 feet north of Maize which was all that was subject to assessment. School property, other exempt property, and state assessed property were given no appraisals at all, although they were subject to assessment.

It is apparent that there was never any intent to use the appraised values as a basis for the assessment, and that they were not in fact used. The evidence is undisputed that the whole matter of determining the amount of the assessments was left up to the city engineer. He testified that the assessments were made on a front foot basis. This was done, he testified, because a front foot basis was as fair and equitable a basis as any. He was unfamiliar with the statute under which the assessments were to be made, and of course paid no attention to it.

The city's bond counsel testified in the same vein. He described the statute as the "old" paving law, and dismissed the statutory requirement for appraisers as an outmoded relic of 1872. He construed *Strickland v. City of Wichita,* supra, as meaning "no more than that you do pick some formula that is fair." Hence, the appointment of appraisers and the filing of their "report" was only a gesture; once the report was filed it was to be ignored.

The city clerk generally agreed with the engineer and attorney, although in response to a leading question by the city attorney she did agree that the appraisers' report was "used to determine all the property should be assessed by a front footage formula to make equitable assessments throughout the project." Just how this result

flowed logically from the premise was never explained. There was certainly nothing to indicate that apportionment by front footage would achieve the same result as apportionment by value.

We cannot escape the conclusion that in making the assessment challenged here the city deliberately ignored the statute under which it purported to be operating. The "new" general improvement law (K. S. A. 12-6a01 *et seq.*) permits a front foot basis as one alternative method of assessment in 12-6a08; the "old" general paving law under which this improvement was made provides only for apportionment according to value. When it initiated this project the city had a choice of statutes to follow. Once it elected to employ the "old" statute it was bound to follow it. "All property owners and taxpayers are entitled to have their properties assessed according to the statutory method." (*Lynch v. Kansas City*, 136 Kan. 348, 15 P. 2d 720, Syl. ¶ 2.) Further:

"The statute having prescribed what shall constitute a taxing district in the matter of paving a street, and also the mode of making special assessments upon private property to pay for the paving, it must be closely followed, and a substantial departure from the method prescribed by the legislature will invalidate the assessment." (*Cravens v. City of Salina*, 101 Kan. 161, 165 Pac. 801, Syl.)

In our view, the use of a method of assessment wholly unauthorized by the applicable statute was such a "substantial departure" as to render the assessment invalid. We therefore hold that the trial court erred in refusing to enjoin the levy of the assessment.

This does not mean, however, that the Dodson property is to escape paying its fair share of the cost of paving Maize street. As previously indicated, there were no deficiencies in the proceedings other than in the assessment proceeding itself. We see no obstacle to the city's making a reassessment, following the statutory procedure. K. S. A. 10-114a would appear to cover any financial problems the city might encounter. If such is to be done, a few further observations are in order.

First, it appears that in determining the "cost" of the improvement to be assessed the engineer took the construction cost and added 20% to cover "legal publication, interest on temporary notes." Presumably the 20% also covers professional fees. So far as the record is concerned the 20% is a purely arbitrary figure, bearing no known relationship to actual costs. The statutes make no provision for such an unsubstantiated estimate; 12-601, 12-602 and 12-608 each speak of the "cost" of the improvement, which we take to mean the actual cost as nearly as can practicably be calculated. K. S. A. 12-6a01 (*d*)

defines "cost" under the general improvement law as costs "necessarily incurred," plus an overhead charge for services rendered by regular city employees not to exceed 5%. K. S. A. 15-709, applicable to third class cities, authorizes adding to construction costs the "actual cost" of a number of incidental expenses, not to exceed 20% of the contract price. Neither is applicable here, the first because the improvement was not made under the statute and the second because Ulysses is a city of the second class. To be sure, the actual cost of improving Maize street would include an aliquot share of expenses attributable to a number of projects which were lumped together for convenience of administration, but we know of no authority for picking 20% or any other percentage out of the air.

Second, the lumping together of a number of projects may be convenient, but it must be remembered that each is in fact a separate project. Thus the paving of two blocks of Maize street was individually subject to protest, quite apart from the eight other paving projects included in the same resolution of necessity. That is to say, in determining whether a protest was signed by the resident owners of more than one-half the property subject to assessment, property assessable only for streets other than Maize would not be counted. By the same token, in appraising—or reappraising—property subject to assessment for Maize, property subject to assessment only for other streets is not to be considered.

Finally, in its original assessment ordinance the city assessed to the Dodson property the cost of the north half of the two "T" intersections, while ordering the cost of the south half to be paid by the city at large. The statute (12-602) provides that the cost of improving "intersections of streets" is to be paid for by the city at large. The trial court held that a "T" intersection comes within the statute and set aside the assessment insofar as it included the north half of the two T's. It is from this portion of the judgment that the city has cross-appealed.

We think the trial court was correct. The only case we find directly in point squarely holds that the unqualified word "intersections" in a statute requiring the cost of intersections to be borne by the city at large covers all types of intersections, including "T" intersections. *Chicago & N. W. Ry. Co. v. City of Seward,* 166 Neb. 123, 88 N. W. 2d 175 (1958). In that case, as here, the city had divided "T" intersections for assessment purposes, charging the half adjoining the terminating streets to the city at large and the other half to the abutting landowner. The court concluded:

"It seems only fundamental that what the city did in considering the cost of improving and paving the intersections created by these four streets intersecting but not crossing Tenth Street cannot be approved. Either the entire area was or was not within the language of [the statute]. There are states wherein division is expressly authorized by statute but such is not the situation in this state." (166 Neb. at 127.)

Other cases, collected in 22 Words and Phrases (Perm. Ed.) 399-402, deal with whether "T" intersections are "intersections" in the context of statutes and rules governing traffic at intersections. Such cases appear almost universally to hold that they are. While not directly in point, such cases do shed some light on the common understanding of the word.

We are admonished by the rules of statutory construction (K. S. A. 1975 Supp. 77-201, *Second*) that, apart from terms of art, "Words and phrases shall be construed according to the context and the approved usage of the language. . . ." Webster says an intersection is "3: a place where two or more highways join or cross. . . ." (Webster's Third New International Dictionary.) In a "T" intersection two highways join.

We agree with the Nebraska court. A "T" intersection either is or is not an intersection—it cannot be half an intersecton. We think in common usage the term "intersection" includes a "T" intersection. Therefore the entire cost of paving such an intersection must be charged to the city at large, as held by the trial court. The judgment on the cross-appeal is affirmed.

On the appeal, the judgment is reversed insofar as it failed to enjoin the levy of the special assessment and the case is remanded for further proceedings in harmony with this opinion.

APPROVED BY THE COURT.