No. 48,039

REX K. BELL and ARLETA J. BELL, his wife, *Appellants*, v. THE CITY OF TOPEKA, KANSAS; NORMA E. ROBBINS, City Clerk; WILLIAM B. McCORMICK; HARRY L. FELKER, III [substituted for GARY S. TAYLOR]; KENNETH L. ELDER; CHARLES F. CAMPBELL and JACK ALEXANDER, as members of the governing body, The Board of Commissioners of the City of Topeka, Kansas, *Appellees*.

(553 P. 2d 331)

Opinion filed July 23, 1976.

*John E. Stumbo,* of Stumbo and Stumbo, of Topeka, argued the cause, and *Gary D. McCallister,* of the same firm, was with him on the brief for the appellants.

*Richard E. Jones,* Assistant City Attorney, argued the cause, and *Dan E. Turner,* City Attorney, was with him on the brief for the appellees.

The opinion of the court was delivered by

KAUL, J.: This is an action instituted by plaintiffs-appellants, Rex K. and Arleta J. Bell, against the City of Topeka and members of its governing body seeking injunctive relief in preventing the city from enforcing certain ordinances levying and assessing part of the costs against their real estate for improving and widening Burlingame Road. The real estate of plaintiffs is situated adjacent to Burlingame Road and is within a benefit district created by the city in connection with the project.

Burlingame Road is one of the oldest established roads in the Topeka area. In 1859 the legislature declared it to be a "Territorial Road" within the description of Chapter CXI of the Laws of 1859. At the time it was a section of a road described by the legislature as running from Atchison to Superior by way of Grasshopper Falls. Shawnee County took over and maintained that portion of the road that was within its boundaries. In a series of annexations, extending from 1952 to 1959, the area in question was .

annexed by the city which took over maintenance of the road. While the road has always been considered a major thoroughfare and required a great deal of maintenance, the city says it has never, heretofore, assessed adjacent property owners for any improvements. There is nothing in the record which indicates to the contrary. Upon the commencement of this action, the trial court granted a temporary injunction prohibiting the challenged assessment being spread upon the record. Following a trial to the court, judgment was entered for the city. The plaintiffs filed timely notice of this appeal and the trial court stayed its order dissolving its temporary injunction pending disposition of this appeal.

The underlying facts are not in serious dispute. In 1965 the city, through its governing body and engineering department, commenced consideration of the improvement of Burlingame Road from a two-lane street to a four-lane major improvement thoroughfare. After numerous studies and public hearings, the activities culminated in the adoption by the City Commission of Resolution No. 1443 on April 23, 1968. The resolution designated, as improvements, the purchase of right-of-way, grading, draining and paving so as to provide for four traffic lanes with additional paving width at intersections with 29th Street, Clontarf Street, 33rd Street and 37th Street. The resolution also recited that the city would enter into an agreement with Shawnee County, making the county its agent, to carry out the construction and providing for joint participation on the project, and that the county should be liable for all engineering design and inspection costs and fifty percent of the construction cost. The resolution further provided that the city would be liable for fifty percent of the construction and right-of-way costs, and that when the city's share of the project cost was determined, fifty percent of that cost should be apportioned to the city at large and fifty percent to the benefit district on a special assessment basis. The major traffic street improvement was entitled "Street Improvement Project No. 114."

The resolution indicated that the city was proceeding under K. S. A. 13-10,115. This statute is entitled:

"Major traffic streets in certain cities in counties over 120,000; resolution; protests; election; temporary notes and bonds; special assessments and payments by city. . . ."

The purpose of the statute is to authorize and provide a special procedure for the designation of major traffic streets and the improvement thereof by cities which meet the qualifications of the

statute as to population and assessed valuation. Although the statute was enacted in 1945, this is its first appearance before this court.

Prior to the adoption of the resolution on November 21, 1967, the city had entered into an agreement with the county by the terms of which the governmental bodies were to cooperate in the construction and funding of the improvement in question. This agreement was silent on the issue of the parties' respective liabilities for engineering design and inspection costs.

Following the adoption of Resolution No. 1443, the city, on July 23, 1968, passed and approved Ordinance No. 12564 authorizing construction of "Street Improvement Project No. 114" in accordance with Resolution No. 1443. The ordinance recited that no protests, in compliance with 13-10,115, had been filed against the resolution.

During the next few years the city held public hearings and meetings with landowners in the proposed benefit district and caused engineering studies and cost estimates to be made for the project. Pursuant to the provisions of 13-10,115, the city undertook to draw boundaries and establish a special benefit district in connection with the project. In this connection the pertinent portion of 13-10,115 reads as follows:

". . . If only a percentage (which shall not be less than fifty percent) of the cost is paid by the city, the remaining cost shall be assessed against the adjacent real property, without regard to the value of the improvements, *to the middle of the block on either side;* and as to unplatted territory, as provided in K. S. A. 12-606 and amendments thereto, without regard to grading district and not by blocks. The portion of the cost to be assessed against the property in the improvement district shall be apportioned in the manner provided in K. S. A. 12-608 and amendments thereto or in the manner provided in K. S. A. 12-6a08." (Emphasis supplied.)

Due to the irregularities in the sizes and shapes of "blocks" adjacent to Burlingame Road, application of this statutory language produced a benefit district varying widely in depth. City officials were concerned with the irregularities of the map, as drawn and as stated in city's brief:

". . . Due to the apparent ambiguity of this map, other plans were prepared in order to comply with what the Appellees deemed to be the true spirit of the statute."

The city proceeded to fashion a new benefit district map creating "fictional blocks" for assessment purposes along Burlingame Road which would be of a more regular and uniform size and shape.

The second benefit district map was accomplished by using the closest parallel streets on either side of the project and computing the distance one-half way to those parallel streets. The city then extended a hypothetical line at this computed distance from and parallel to Burlingame Road for the entire length of the project and on both sides thereof. All properties adjacent to the project and within these imaginary lines were deemed by the city to be included in the benefit district thus created.

In the meantime, on August 13, 1974, the district court of Shawnee County had entered a judgment in an unrelated case entitled *Emland Builders, Inc. v. The City of Topeka, et al.,* No. 114,984, upon which the city relied for authority in creating the second benefit district by the extension of the imaginary lines from parallel streets which dead-ended against some of the larger blocks which were included to the center line in the first benefit district. The city's authority to so establish the revised benefit district by the creation of "fictional blocks" is the major issue involved in this appeal.

In the course of public hearings on the proposed assessments and establishment of the benefit district, on April 30, 1974, City Commissioner Elder moved that the proposed assessment be referred back to the city engineering and finance departments for reevaluation of the project:

". . . 'minus the intersections of 29th and 37th Streets and less condemnation for property outside the benefit district. . . .' "

The motion carried unanimously. Pursuant to the motion, the city departments involved, subtracted a portion of the construction costs of the two intersections mentioned and also subtracted a part of the right-of-way condemnation costs expended in connection with the building of the two intersections in question. As a result of the departments' reevaluation, pursuant to Commissioner Elder's motion, only a portion of the costs of the two intersections were subtracted from the benefit district's share of the cost of the project. The city proceeded to adopt Ordinance No. 13654 which apportioned and levied special assessments on the lots and parcels within the boundaries of the revised benefit district. Following this action of the city the plaintiffs filed their petition instituting this litigation.

In their petition plaintiffs advanced several instances which were alleged to be conclusive evidence that the city had acted in an arbitrary, capricious and unreasonable manner. After a trial and

submission of briefs, the trial court determined that plaintiffs had failed to sustain their burden of showing arbitrary, capricious, fraudulent or unlawful actions. Judgment was entered for the city and this appeal ensued.

Plaintiffs brief seven points on appeal. Their first two points involve the construction of the statute under which the city elected to proceed. Although several statutory schemes were available for such projects, the city chose to proceed under 13-10,115, which appears to be specifically adaptable to the improvement or reim-provement of streets in certain cities, that are declared to be "major traffic streets," as distinguished from ordinary street improvement projects which are provided for by other statutes. By its election of 13-10,115, the city became bound to follow its provisions, not-withstanding that provisions in alternative statutes may have seemed more attractive or even more equitable to the city governing body. This principle is firmly embedded in decisions of this court dealing with assessments for street improvements. In the early case of *Cravens v. City of Salina,* 101 Kan. 161, 165 Pac. 801, we said:

". . . The plaintiffs are entitled to have their property assessed ac-cording to the statutory method, and, as we have seen, the departure from that method resulted in a substantial increase in the assessments that were made. The city may not adopt a different plan of assessment because it may be more convenient for the mayor and council or because its officers may think it to be more equitable in its application. The legislature had the au-thority to make an apportionment, and it is well established that statutory rules making special assessments upon private property must be strictly fol-lowed. . . ." (p. 163.)

Our holding in *Cravens* has been followed in numerous subsequent cases, *e. g., Atchison, T. & S. F. Rly. Co. v. City of Kingman,* 122 Kan. 504, 252 Pac. 220; and *Railway Co. v. City of Topeka,* 103 Kan. 897, 176 Pac. 642. The most recent case, *Dodson v. City of Ulysses,* 219 Kan. 418, 549 P. 2d 430, involved a paving project which was undertaken pursuant to the "old" general paving law, K. S. A. 12-601, *et seq.* However, the City of Ulysses attempted to employ a front foot method of assessment. This method is an au-thorized alternative under the "new" general improvement and assessment law, K. S. A. 12-6a01, *et seq.,* but not under the "old" law which provided only for assessments according to value. Con-cerning this departure from statutory provisions, we said in the *Dodson* opinion:

". . . When it initiated this project the city had a choice of statutes to

follow. Once it elected to employ the 'old' statute it was bound to follow it. . . ." (p. 425.)

So, in the instant case, the city, once having elected to proceed under 13-10,115, is bound to follow the provisions thereof. It follows that affected property owners are entitled to have their property assessed according to the statutory method, and a substantial departure from the method prescribed by the legislature will invalidate the assessment.

In their first two points plaintiffs assert that 13-10,115 is mandatory with respect to the apportionment of costs and that if mandatory then the benefit district finally created by the city is insufficient in size, based on the definition of "block," as the word appears in the statute. It should be noted that the first proposed benefit district included some 250 parcels of land which was reduced to 80 in the district finally adopted.

We turn to the question whether the pertinent language of 13-10,115 must be treated as mandatory. The critical words are:

". . . [T]he remaining cost *shall* be assessed against the adjacent real property, without regard to the value of the improvements, *to the middle of the block* on either side; . . ." (Emphasis supplied.)

Adversely to plaintiffs' position, the city maintains the language in question is discretionary only, and that as a consequence a misconstruction of the word "block" should not invalidate the assessment. In our view, the city's position is untenable.

This court delineated the test to be applied in determining whether statutory language is mandatory or directory in *Wilcox v. Billings*, 200 Kan. 654, 438 P. 2d 108, wherein we said:

"No absolute test exists by which it may be determined whether a statute is directory or mandatory. Each case must stand largely on its own facts, to be determined on an interpretation of the particular language used. Certain rules and aids to construction have been stated. The primary rule is to ascertain legislative intent as revealed by an examination of the whole act. Consideration must be given to the entire statute, its nature, its object, and the consequences which would result from construing it one way or the other. It has been said that whether a statute is directory or mandatory depends on whether the thing directed to be done is of the essence of the thing required, or is a mere matter of form. Accordingly, when a particular provision of a statute relates to some immaterial matter, as to which compliance with the statute is a matter of convenience rather than substance, or where the directions of a statute are given merely with a view to the proper, orderly, and prompt conduct of business, it is generally regarded as directory, unless followed by words of absolute prohibition; and a statute is regarded as directory where no substantial rights depend on it, no injury can result from

ignoring it, and the purpose of the legislature can be accomplished in a manner other than that prescribed, with substantially the same results. On the other hand, a provision relating to the essence of the thing to be done, that is, to matters of substance, is mandatory, and when a fair interpretation of a statute, which directs acts or proceedings to be done in a certain way, shows that the legislature intended a compliance with such provision to be essential to the validity of the act or proceeding, or when some antecedent and prerequisite conditions must exist prior to the exercise of power or must be performed before certain other powers can be exercised, the statute must be regarded as mandatory. (82 C. J. S., Statutes, § 376)." (pp. 657-658.)

A long line of Kansas cases has apparently treated statutory language such as that encountered in the case at bar as mandatory, although the mandatory-directory dichotomy is not specifically enunciated therein. Exemplary of this line of cases is *Atchison, T. & S. F. Rly. Co. v. City of Kingman,* supra, wherein we said:

". . . The legislature has prescribed the plans and limits of assessments for the improvement of streets and the statutory rules prescribed for levying assessments on private property must be strictly followed. (*Simpson v. Kansas City,* 46 Kan. 438, 26 Pac. 721; *Cravens v. City of Salina,* 101 Kan. 161, 165 Pac. 801.) . . ." (p. 506.)

See, also, *Dodson v. City of Ulysses,* supra; and *Schulenberg v. City of Reading,* 196 Kan. 43, 410 P. 2d 324.

It is true, the word "shall" when employed in a statute has been read to mean "may." (See *Paul v. City of Manhattan,* 212 Kan. 381, 511 P. 2d 244; and *Wilcox v. Billings,* supra.) This interpretation of "shall" has been approved when the term was employed in a statutory provision directing the mode of proceeding by public officers, and the legislative intention was to secure order, system and dispatch in proceedings, and where the rights of parties could not be injuriously affected by the disregard of the particular statutory provision. In this connection we held in *City of Hutchinson v. Ryan,* 154 Kan. 751, 121 P. 2d 179:

"In determining whether statutory provisions are mandatory or directory, it is a general rule that where strict compliance with the provision is essential to the preservation of the rights of parties affected and to the validity of the proceeding, the provision is mandatory, but where the provision fixes a mode of proceeding and a time within which an official act is to be done, and is intended to secure order, system and dispatch of the public business, the provision is directory." (Syl. 1.)

In the statutory context in which "shall" is used in K. S. A. 13-10,115 it is not employed to direct a mode of proceeding and to secure order and dispatch, but rather to declare specifically how assessments shall be taxed with respect to both platted and unplatted

land. When the taxing clause is read in the context of the entire statute, it seems clear that the purpose of the legislature could not be accomplished in a manner other than that prescribed. Obviously, the taxing clause in question affects substantial property rights and is the very essence of the things to be done. We have no hesitancy in holding the statutory provision in question to be mandatory.

We turn next to the definition of "block," as it appears in 13-10,115—the major issue in this appeal. At the outset, in considering this issue, it must be kept in mind that this case involves only "platted" land. Almost from the inception of statehood, this court has been confronted with litigation involving the definition of "block," as it has been used in statutes and municipal ordinances relating to the taxing of costs for the improvement of streets and alleys. As early as 1865 this court in *Hines et al. v. City of Leavenworth et al.*, 3 Kan. (2d.) 180, was confronted, *inter alia*, with the constitutionality of a street improvement statute which the court said required that "the charge must extend back to the middle of the block."

In 1872, in *City of Ottawa v. Barney*, 10 Kan. (2d) * 270, the court for the first time defined "block" as used in a street improvement statute and considered the underlying rationale of the assessment to the middle of the block concept for street improvements. The pertinent portion of the statute involved was said to be:

". . . 'For macadamizing, the assessments shall be made on all lots and pieces of ground to the center of the block extending along the street or avenue the distance improved, or to be improved, according to the assessed value of the lots and pieces of ground,' etc. Laws 1871, p. 149, § 16, cl. 3." (* pp. 277-278.)

The issue in litigation arose because blocks adjacent to the improved street were divided into lots only a few of which touched upon the street. The city, rather than assessing against all lots, or portions thereof, to the middle of the block, taxed only those lots abutting on the street. The trial court upheld the city; this court reversed.

The underlying issue in *Ottawa* is analogous to that raised where irregular blocks are involved such as in the case at bar. Justice Brewer speaking for the court defined "block" in terms which have been consistently adhered to down through the years and he also delineated the underlying rationale of "middle of the block" assess-

ments, which is threaded through our many subsequent cases dealing with the subject. Justice Brewer said:

". . . A block is defined by Webster as 'a square or portion of a city inclosed by streets, whether occupied by buildings or composed of vacant lots.' It is a portion of ground surrounded by streets. Taxing to the center of the block for the improvement of the surrounding streets makes each portion bear its proper share of the total burden. Otherwise, the central lots will bear only a part of the burden of the improvements in the front of the block, while the end lots will bear an equal share of this, and the whole burden of more on the side of the block. This would be evidently unfair unless the central lots received no benefit from the improvements on the side. But the fact is the whole block receives benefit from the improvements made anywhere around it. Especially is this true of the 'squares and areas formed by the crossing of streets,' the improvement of which benefits the front of the block as much as the side; and yet the cost of this is collected in the same way. The end lots may receive more benefit from improvements on the side, but being valued more highly will pay more for those, as well as for the improvements in front. There is a certain sort of relationship between street and blocks, whose existence we all appreciate, no matter how illy it may be in fact recognized. The streets are for the service and use of the blocks; and the idea is that there should be such an adjustment of their numbers and size that each portion of the block should receive all needful service from the streets." (* pp. 278-279.)

Concerning the definition of block, it was stated in *Bowlus v. Iola*, 82 Kan. 774, 109 Pac. 405:

". . . According to all the dictionaries and the popular understanding everywhere a block is a portion of a city surrounded by streets. . . ." (p. 776.)

And in *Larson v. City of Ottawa*, 101 Kan. 422, 166 Pac. 565, we said:

". . . In the matter of assessments for street improvements there has been uniformity of decision that a block is a square or tract of platted land surrounded by streets (citing cases)." (p. 424.)

See, also, *Colorado Oil & Gas Corp. v. City of Topeka*, 196 Kan. 337, 411 P. 2d 586.

The underlying theory, expressed in the *Ottawa* case, that land lying between the center line of a block, regardless of size, and the improved street is specially benefited because it is necessarily closer to the improved street than to any other street running in the same direction may be gleaned from many of our subsequent decisions.

In cases dealing with assessment against platted land for street improvements, under various statutes, irregularity in size has never been regarded as cause for departing from the statutory rule nor as

invalidating the assessments made. In *Railway Co. v. City of Topeka*, supra, we held:

"In making and apportioning a special assessment for paving a street in a platted portion of the city, the block is the unit, and the fact that the block may vary in size and shape from others in the city does not [a]ffect the rule, or the validity of the assessment." (Syl. 1.)

To the same effect it is stated in *Cravens v. City of Salina*, supra:

". . . Some blocks abutting on a street are deeper than others, but a variation in depth has never been regarded as cause for departing from the statutory rule nor as invalidating the assessments made." (p. 164.)

In a few exceptional cases it has been said that the boundaries of a block may be determined by the topography of the ground or where ground is platted into blocks in the extreme outskirts of a city or where the land in question abuts on a river or other natural or man made obstruction. (*Colorado Oil & Gas Corp. v. City of Topeka*, supra; and *Atchison, T. & S. F. Rly. Co. v. City of Kingman*, supra.) No such exceptional circumstances exist in this case—the city basing its theory solely on the irregularity in size and shape of the blocks in question.

Previous attempts by cities to create "fictional blocks" in establishing benefit districts under statutes similar to 13-10,115 have been condemned by this court. In *Lynch v. Kansas City*, 136 Kan. 348, 15 P. 2d 720, the city designated an alley as a street thereby creating two blocks from what was previously one and thus substantially affecting the boundaries of the benefit district in question. In condemning the city's action this court relied on the rule enunciated in *Cravens* that statutory rules making special assessments upon private property must be strictly followed and further stated:

"Substantially all that has been effected by the change of denomination of this dedicated alley to a street has been the change of the benefit district. This, as quoted above, is not the province of the city commission." (p. 352.)

To the same effect this court held in *Bowlus v. Iola*, supra, that a landowner in his plat of dedication could not change the extent of a benefit district by numbering as two separate blocks the parts of a block separated by an alley.

In *Sports Center, Inc. v. City of Wichita*, 176 Kan. 84, 269 P. 2d 399, the city attempted to create a fictional block in precisely the same manner as that employed by the city herein. In a street improvement proceeding under G. S. 1949, 12-601, the city considered as extended through a tract of land streets only the ends of which abutted that tract and thus created a fictional block. This court

noted that no statutes were cited authorizing the city to so create a block for the purposes of assessment for street improvements and held:

"Under the statutes of this state a city has no power to consider as extended through a tract of land streets only the ends of which abut that tract and thus create a fictional block where in fact there is none." (Syl. 2.)

We believe *Sports Center, Inc.*, to be squarely in point with the issue presented here and must control our decision.

The city cites *Mai v. City of Topeka*, 191 Kan. 589, 383 P. 2d 553, in support of its argument that in particular factual situations strict application of statutory middle of the block assessment must give way to a "common sensical" approach in defining the word "block." The *Mai* case is not in point. The land involved was unplatted, both as to lots and blocks, but since the tract in question was surrounded by streets, it was treated by the city as a block for street improvement assessment purposes. This court ruled adversely to the city's position on the grounds that the tract in question was unplatted and was of such size that it was evident, that to be developed, it would have to be multisected by streets into numerous blocks for the purpose of platting building sites. The court ruled that the tract must be assessed as unplatted land in accordance with the statute. (G. S. 1949, 12-606.)

Likewise, the case of *Union Pac. Rld. Co. v. City of Russell*, 119 Kan. 350, 240 Pac. 264, cited in *Mai*, dealt with a mixture of platted and unplatted land. Neither *Mai* nor *Union Pac. Rld.* lends support to the proposition that fictional blocks may be created by considering as extended through tracts of platted land streets only the ends of which abut the land in question.

The city says that in revising the benefit district it relied upon the Shawnee County District Court decision of August 13, 1971, in the unrelated case of *Emland Builders, Inc. v. The City of Topeka, et al.*, No. 114,984. The decision is reproduced in the record and appears to be a ruling on a motion for a new trial in which it appears the district court reversed its prior judgment against the city. The case involved a proceeding under 13-10,115, in which the city, apparently as in the instant case, considered as extended through a block, a street which ended. The gist of the district court's ruling appears as follows:

". . . [T]he Court directs that its judgment be further corrected to reflect that Block 'C' of Bluewood Subdivision be divided into two blocks at the point that Belle Avenue runs into said block 'C' (See *Wise v. City of Chicago*,

183 Ill. App. 215, 216, cited in Black's Law Dictionary, Fourth Edition, for the proposition that on occasion a block may be construed not to extend between two streets that completely cross the street in question, but to stop at a street running into it although not across it)."

The citations referred to are the only authorities mentioned by the court in its letter of decision. *Wise v. City of Chicago, et al.*, 183 Ill. App. 215, is a 1913 Illinois Court of Appeals decision involving a city ordinance which prohibited the building of a garage on a street where a certain percent of the buildings on both sides of a block are residences. In *Wise* the word "block" was construed as to its meaning as a linear measure on a street rather than its meaning when used to designate a tract or square of platted land. The issue in *Wise* was whether a linear block extended from an intersecting street beyond a dead-end or "T" intersecting street to a street which completely intersected the street in question. The court held that in such a case, a linear block ran only to the "T" intersecting street. The decision is unrelated to the issue at bar.

Apparently, the city in the *Emland* case acted upon a misinterpretation of the statute. In this connection this court held in *Bowlus v. Iola*, supra:

"The fact that in previous similar cases the city acted upon a misinterpretation of the statute in assessing street improvements does not estop it from now proceeding according to law." (Syl. 2.)

See, also, *Lynch v. Kansas City*, supra.

The permissible methods of assessment are clearly set out in precise language in 13-10,115. The distinction to be made between the assessment of platted and unplatted land is unequivocally distinguished. The definition of "block" employed by this court in connection with similar language, appearing in other statutes, has been in our reports for many years. It must be assumed that the legislature intended that the same meaning would be given to "block" when 13-10,115 was enacted in 1945, even though alternative, more flexible statutes have been subsequently enacted. As had been demonstrated, it is firmly established in this jurisdiction that once a city has chosen a statutory proceeding the provisions of the particular statute must be followed throughout the course of the proceedings. We hold the trial court erred in approving the city's definition of "block" in establishing its revised benefit district as being unlawful in contravention of the express provisions of 13-10,115, and that portion of the trial court's judgment is reversed.

Plaintiffs next claim the city violated a binding motion passed by it deleting from the benefit district a portion of the costs of the major traffic thoroughfare. Plaintiffs' contention on this point is directed at the inclusion of a portion of the costs of the 29th and 37th Streets intersections in the levy against the district. In the city's master plan for major traffic thoroughfares, adopted in 1958, 29th Street was designated a major traffic thoroughfare throughout its course across the city. The portion of 37th Street extending from Burlingame Road through Topeka Boulevard, the major north-south trafficway in the city, was, likewise, designated in the master plan. It is undisputed that both 29th and 37th Streets were justifiably designated major traffic thoroughfares. The intersections in question are described as sophisticated and highly developed, including extensive median strips and left-hand turn lanes, and all purpose traffic signals.

The record reflects much confusion in the tortuous course of these proceedings in connection with the costs of the subject intersections. Plaintiffs first direct our attention to a motion passed by the city governing body on April 30, 1974, which is reflected in the city's minutes as follows:

"Commissioner Elder moved the matter be referred to the Engineering and Finance Departments for re-evaluation of project minus the intersections of 29th and 37th Streets and less condemnation for property outside the Benefit District and continue the public hearing thirty days. Motion carried unanimously."

Plaintiffs argue that the city became absolutely bound by the motion and, thus, was compelled to delete, from the benefit district assessment, the entire cost of the intersections. We cannot agree with plaintiffs' interpretation of the wording of the motion. We read the motion only as a referral for a reevaluation to be considered at a later time by the city commission. However, we do consider actions of the city in this regard as some evidence of a willingness to delete the intersections' costs and as demonstrating the city commission's state of indecision concerning the matter. Plaintiffs also point out that in a declaratory judgment case, preceding the instant litigation, but involving the same parties, the city in its answer to plaintiffs' petition alleged that:

"Defendant denies that it *has or intends to include any of the cost of the intersections at 29th or 37th Streets* or of condemnation of property outside the special assessment district *in the special assessments to be levied against Plaintiffs* (Emphasis supplied.)"

At a special session of the commission on June 4, 1974, the revised figures concerning costs of the intersections were presented to the commission by the city engineering department. The events of this special session of the commission are stipulated to by the parties as follows:

". . . The Mayor said he was under the impression that all of the intersections were to [be] taken out. In order to have further study of the question, the Mayor suggested continuing the hearing. Commissioner Taylor moved the Public Hearing be continued for thirty days. Motion carried unanimously. However, no later action has ever been taken to change the deductions at any subsequent hearing."

It appears, from the stipulation, that the city commission never formally terminated the matter of reconsidering the intersections question. We find no evidence of fraud or bad faith. However, the admissions and indecisiveness of the city commission, as shown by the circumstances related, considered together with insignificance of the benefits, if any, resulting to local residents from the thoroughfare intersections, we believe, compel the conclusion that the assessment of any part of the costs of the intersections against the benefit district would result in palpable injustice.

In their seventh point, plaintiffs argue that the tax burden imposed by the proposed project plan is grossly disproportionate to any special benefits received by plaintiffs' property. We believe the argument is particularly persuasive with respect to the intersections in question. Where intersections, such as those in question, are designed, primarily to control the pattern and flow of through traffic into and across the intersections of major thoroughfares, the benefit, if any, to adjacent property is obviously negligible in comparison to the city at large.

It is true, as the city points out, 13-10,115 contains no provision relating to the balancing of benefits. However, this court has recognized that the foundation of the power to levy a special assessment for a local improvement of any character, is that the property against which the assessment is levied derives some special benefit from the improvement. (*Mullins v. City of El Dorado*, 200 Kan. 336, 436 P. 2d 837; and *State Highway Commission v. City of Topeka*, 193 Kan. 335, 393 P. 2d 1008.) Although the law does not require that a special assessment correspond exactly with the benefits received, this court has said that if the burden imposed is entirely disproportionate to benefits received courts will, under their equity powers, grant relief. (*Schulenberg v. City of Reading*, 196

Kan. 43, 410 P. 2d 324; *Hurley v. Board of County Commissioners,* 188 Kan. 60, 360 P. 2d 1110; and *Railroad Co. v. Mitchell County,* 110 Kan. 582, 204 Pac. 729.)

We are well aware of the principle recognized in all of our special assessment cases that the action of municipal authorities in making special assessments is presumed to be legal, equitable and just, and the assessment is prima facie evidence of the regularity and correctness of all prior proceedings. (*Mullins v. City of El Dorado,* supra; *Grecian v. Hill City,* 123 Kan. 542, 256 Pac. 163; 14 McQuillin, Municipal Corporations, § 38.183.) Circumstances warranting court interference are set out in *Hurley v. Board of County Commissioners,* supra, wherein we held:

"Ordinarily the question of the existence and extent of special benefit resulting from a public improvement for which a special assessment is made, is one of fact to be determined by the administrative body authorized to act in the premises and is conclusive on the property owners and the courts. Inherent in the rule, however, is that an assessment so made must be fair, just and equitable, and if palpable injustice results courts will, under their equity powers, grant relief." (Syl. 1.)

Under the particular facts and circumstances surrounding the city's actions concerning the intersections in question, viewed together with the extreme disproportion of the burden imposed to the benefits received, we hold that the assessment of any costs of the 29th and 37th Streets intersections against the benefit district property is arbitrary and unreasonable and that such assessment must be enjoined.

While what has been said disposes of the major issues involved in this appeal, because this is the first appearance of 13-10,115 before this court several other matters raised by plaintiffs deserve brief attention. Plaintiffs claim the city misinterpreted the provisions of the statute specifying the minimum amount which must be paid by the city at large. The language of the statute pertinent to this point reads:

". . . If only a percentage (which shall not be less than fifty percent) of the cost is paid by the city, the remaining cost shall be assessed against the adjacent real property, without regard to the value of the improvements, to the middle of the block on either side; . . ."

Plaintiffs say that the term "costs" as used should be interpreted to mean the *"total cost"* of a project without regard to any participation by other governmental bodies or the use of federal funding. Under the plan for this project, plaintiffs' interpretation would

eliminate altogether any assessment against the district. If the city at large were required to pay fifty percent of the total costs, federal funding would pay the other fifty percent. The city, on the other hand, says "costs" means net cost to the city. The city, in planning, and the trial court in deciding the issue, relied upon an opinion of the attorney general. In his opinion, which is reproduced in the record, the attorney general relied upon *City of Camilla v. Cochran,* 160 Ga. 424, 128 ,S. E. 194, which we have examined and found to be in point. The Georgia Supreme Court in construing a street improvement statute, similar to that before us, said:

". . . The City of Camilla is authorized to assess the cost of paving and otherwise improving its streets against the owners of real estate abutting on said streets, as well as against said real estate, provided the amounts so assessed against property owners for said purposes shall in no instance be more than two thirds of said cost. Ga. Laws 1919, p. 867. The term 'cost,' as used in this act, clearly means the amount which the city had to expend in paving its streets." (p. 431.)

We have examined cases cited by plaintiffs, but find them not to be in point. We believe a fair reading of the pertinent provisions indicates the word "cost" in the context used means cost to the city. The trial court correctly ruled on the matter and its decision is affirmed.

Plaintiffs also contend the provisions of Resolution No. 1443 and provisions of the agreement between the city and the county were in conflict as they related to the payment of engineering costs and, therefore, inclusion of any of those costs in the assessment against the benefit district were illegal. As previously noted, the agreement between the city and county is silent regarding their respective liabilities for engineering and design costs. In passing the resolution, the city undoubtedly contemplated asking the county to pay these costs, but, as the city says, it was simply unsuccessful. We find no merit in plaintiffs' contention in this regard. The trial court in finding No. 6 found the engineering costs were properly included in the overall costs and its rulings is affirmed.

Other points raised by plaintiffs are, by reason of our decision, found to be either moot or without merit.

On appeal the judgment is reversed with respect to the boundary lines of the benefit district and the assessment of costs of the 29th and 37th Streets intersections and is affirmed in all other respects. The case is remanded for further proceedings in harmony with this opinion.