**MORTON SALT CO. v. CITY OF SOUTH HUTCHINSON et al.**

No. 3731.

United States Court of Appeals
Tenth Circuit.

Nov. 21, 1949.

Harvey Wienke, Chicago, Ill. (Roy C. Davis, Hutchinson Kan., was with him on the brief) for appellant.

J. Richards Hunter, Hutchinson, Kan. (Walter F. Jones and Harry H. Dunn, Hutchinson, Kan., were with him on the brief) for appellees.

Before PHILLIPS, Chief Judge, and HUXMAN and MURRAH, Circuit Judges.

MURRAH, Circuit Judge.

When this case was here in 10 Cir., 159 F.2d 897, we held the allegations in the complaint to the effect that the complainant, Morton Salt Company, would be required to pay 46 per cent of the tax burden of a city waterworks system, from which it could receive no benefit, posed a serious constitutional question which the court should resolve only after a full hearing on the merits. We accordingly directed the trial court to temporarily restrain the issuance and sale of the improvement bonds, until a final hearing on the issues as raised by the pleadings.

Upon a trial of the case, the court concluded that in view of the direct and indirect tangible benefits which the appellant can expect to receive, both immediately and in the future, from the installation of the proposed waterworks system, as well as the legally presumed intangible benefits resulting from the privilege of being a part of an organized community, the payment of its pro rata share of the tax imposed for the waterworks system does not constitute a denial of equal protection of the laws or the taking of property without due process of law; that the proposed acts of the defendants are neither arbitrary, an

abuse of power, an exercise of bad faith nor fraudulent. The court denied injunctive relief, dismissed the action, and the Salt Company has appealed, contending, as before, that the imposition of the tax without any resulting benefits is in excess of the City's constitutional power to tax property within its jurisdiction.

The court's conclusions are based upon extensive and detailed findings from the evidence, to the effect that the appellant Salt Company is the owner of an aggregate of 38 acres of land in the extreme northwestern part of the City of South Hutchinson. The Company's salt and ice plant, consisting of fifty-one buildings, is located on the northwestern part of the 38 acres. Ten Company dwellings are located near the plant, and are occupied by eleven of its employees. The remainder of the Company land, as well as other land, between this improved section and the populated district of the City, is unplatted and unimproved. In all, one hundred and eighty employees are employed by the Company, about fifteen of which reside in the City of South Hutchinson, and the remainder either in the City of Hutchinson, across the Arkansas River, or in rural Reno County. The appellant's real estate comprises 22 per cent of the total area within the city limits, with an assessed valuation of $412,670 or 46 per cent of the assessed value of all of the property within the City. During the time in which the Salt Company's property has been located within the city limits of the City of South Hutchinson, the City has assessed and taxed the property as other property located therein.

In the operation of its plant, the Company uses large quantities of water which it obtains from its own wells, by use of its own equipment, without cost or expense to the City. It also supplies water for the domestic use of its employees living on its property. Its water supply, at the rate of 2950 gallons per minute, is also available for fire-fighting purposes. For years the Company has maintained an arrangement with the City of Hutchinson, across the River, under which modern fire-fighting equipment and trained personnel are available in case of fire at the plant, and this arrangement will be continued if the City of South Hutchinson constructs a water system.

There are approximately 270 homes and places of business in the City of South Hutchinson. The boundary of School District Number 136 practically coincides with the boundaries of the City, and the school building is located therein. At the time of the trial of the case, 260 to 275 children were enrolled in the school. The entire City is underlaid with water-bearing sand or gravel, found anywhere in the City from 6 to 10 feet deep, and at some seasons of the year, the water level raises above the surface. There being no sewage system, the excrement from outdoor facilities and cesspools frequently cause many of the wells and the water in them to become and remain polluted, with organisms causing such diseases as typhoid fever and dysentery. The drinking water for the public school is secured from a well which often "caves in", making it necessary to dig other wells, and the pump must be frequently overhauled at a constant cost and expense to the School District.

On advice of the Division of Sanitation of the Kansas State Board of Health, the Mayor of the City of South Hutchinson took preliminary steps toward the construction of a city water system. An engineer was employed who prepared preliminary estimates, and accompanied the Mayor to the Salt Company's plant, where they conferred with its Manager concerning the waterworks system. Three separate designs were under consideration, one of which included a water main for service to the Company's plant. At this conference, the Mayor and the engineer were informed, in answer to inquiry, that the Company did not wish to be included in the waterworks system, and the proposed line extending approximately 1000 feet to the Company's property line was therefore eliminated from the plans. The plans originally contemplated an 8 inch pipeline, capable of supplying approximately 700 to 750 gallons of water per minute to the Company's property. It would have extended along the street in front of five of the houses located upon the appellant's premises, and would

have provided two fire hydrants to aid in furnishing protection to the appellant's plant.

The issuance of the bonds in the sum of $115,000 was duly authorized by an election on June 3, 1946, and if the proposed system is constructed as contemplated, it will furnish a sufficient supply of potable water to the inhabitants of the City, except the salt plant, and will materially improve the City's ability to cope with fires within the city limits. But it will not supply water for the commercial use of the Company, for the domestic use of Company employees living upon Company property, or for the fire protection of Company property. An extension to the presently contemplated system could be made at a cost of approximately $68,000, which would provide water to the Company for fire protection and domestic use, but not for its commercial use. The authorized bonds are general obligations of the City which, when registered, issued and sold, will be paid in twenty annual installments, with an average interest rate of about 2 per cent, by pro rata assessment of taxes upon all the property within the City.

To show that the Company will not now or in the future derive any direct or tangible benefit from the water system, our attention is called to General Statutes of Kansas 1945 Supp. 12-836, providing in effect that cites of a city of the class of the City of South Hutchinson, whose total indebtedness does not exceed 15 per cent of its total assessed valuation, are empowered to issue bonds for the purpose of enlarging, repairing, extending or improving its water systems, in any sum not exceeding 2 per cent of the total assessed valuation of the property of the city as shown by the assessment books for the year preceding the issuance of such bonds; and General Statutes of Kansas 1935 12-821, authorizing a city to extend its mains or transmission lines within or without the city by construction or purchase, when applications have been made and agreements entered into by persons along the proposed extension that will produce a revenue in the judgment of the governing body, sufficient to pay interest on the cost of the extension, and the operating cost of the product or service furnished. It is suggested in that connection that the cost of extending the water system to the Company's plant gates in the sum of $68,000, is far in excess of the authorized 2 per cent of the total property valuation, and that since, with one exception, only the Company and its ten employees occupying Company houses and using free water, could be users along any extension line, no agreement could be entered into for a proposed extension which would produce a revenue in the judgment of the governing body sufficient to pay interest on the cost of service as contemplated by Section 12-821.

The City counters with the suggestion that the original and tentative plans for the water system included service to the Company as to other inhabitants of the City, and that when the Company expressed its desire to be "left out" of the plans and designs for the system, it thereby forfeited any right to complain of a lack of benefits. Then it is denied that the limiting statutes invoked have the legal effect of forbidding the City to issue additional bonds for the extension of the water system from year to year as the old bonds are retired. The trial court agreed with the City that the statutes are not insurmountable barriers to the extension of the water system to include service to the Company.

■ We need not stop to weigh the possibilities or the probabilities that the water system can or will be extended to provide service to the Company. Nor must we decide whether, upon application or demand, the City would be compelled to furnish water to the Company as to other residents of the City. We proceed upon the premise that there is no immediate likelihood that water will be available to the Company as a direct and tangible benefit for its tax burden. But even so, the constitutional requirement that the City must give something for its exactions is not a quid pro quo which requires the City to return in kind or even the equivalent for its exactions.

■ As we pointed out in the former appeal, there is a valid distinction between

a special tax or assessment to finance special improvements designed to benefit property or persons located within a particular taxing district, and an ad valorem tax on all the property within the taxing jurisdiction for the general welfare of the whole community. Since the special tax is intended to confer a peculiar benefit upon members of a particular class organized for that purpose, the tax burden must bear some reasonable relationship to the intended benefits. French v. Barber Asphalt Paving Co., 181 U.S. 324, 21 S.Ct. 625, 45 L.Ed. 879; Houck v. Little River Drainage Dist., 239 U.S. 254, 265, 36 S.Ct. 58, 60 L.Ed. 266; Myles Salt Co. v. Iberia Drainage Dist, 239 U.S. 478, 36 S.Ct. 204, 60 L.Ed. 392, L.R.A.1918E, 190; Kansas City Southern Ry. Co. v. Road Improvement Dist., 256 U.S. 658, 41 S.Ct. 604, 65 L.Ed. 1151; Thomas v. Kansas City Southern Ry. Co., 261 U.S. 481, 43 S.Ct. 440, 67 L.Ed. 758; Straight Creek Drainage Dist. v. Chicago, R. I. & P. Ry. Co., 10 Cir., 36 F.2d 650.

■ When, however, the tax is levied upon all the property for public use, such as schools, the support of the poor, for police and fire protection, for health and sanitation, for waterworks and the like, the tax need not, and in fact seldom does, bear a just relationship to the benefits received. Thus the property of a corporation may be taxed for the support of public schools, asylums, hospitals, and innumerable public purposes, although it is impossible for it to derive any benefits other than privileges which come from living in an organized community. The benefits are intangible and incapable of pecuniary ascertainment, but it is constitutionally sufficient if the taxes are uniform and are for public purposes in which the whole city has an interest. i. e. see Kelly v. Pittsburgh, 104 U.S. 78, 26 L.Ed. 658; Thomas v. Gay, 169 U.S. 264, 18 S.Ct. 340, 42 L.Ed. 740; Henderson Bridge v. Henderson, 173 U.S. 592, 19 S.Ct. 553, 43 L.Ed. 823; Wisconsin v. J. C. Penny Co., 311 U.S. 435, 61 S.Ct. 246, 85 L.Ed. 267, 130 A.L.R. 1299; Cooley on Taxation, 4th Ed., Sec. 89, p. 214.

■ The challenged tax will be imposed for a waterworks system to provide water for the direct benefit of the inhabitants of the City who use it. But a primary object and purpose of the system is to safeguard the health of all of the residents by eliminating the public hazards of contaminated wells. Thus the benefits to be derived may be said to be both special and general. If the Salt Company can be taxed for the support of a school system, from which it can derive no tangible benefit except the compensation of living in an enlightened community, we can find no constitutional objection to a uniform tax upon its property for a water system deemed essential for the health and safety of the children who attend the public school. In either case, the tax is for a public purpose, and insofar as the corporation is concerned, the benefits to be derived are intangible and not susceptible of pecuniary evaluation, but are nonetheless very real in a constitutional sense.

The judgment is affirmed.

PHILLIPS, Chief Judge (concurring).

The opinion of the court has my full concurrence but it seems to me, the conclusion that ad valorem taxes to create a fund to pay the principal and interest of the waterworks bonds will not be so palpably arbitrary and discriminatory as to violate the Fourteenth Amendment, will more clearly appear if certain facts are more fully stated and emphasized.

The Morton Salt Company, hereinafter called Morton, purchased land within the territorial limits of the City of South Hutchinson, hereinafter called the City, and constructed its plant on such land. It must have known when it did so that its property would be subject to ad valorem taxes for general municipal purposes such as public health, fire and police protection, waterworks, and public schools.

What the Supreme Court said in Kelly v. Pittsburgh, 104 U.S. 78, 82, 26 L.Ed. 658, with respect to ad valorem taxes assessed against a tract of farm land within the city limits of Pittsburgh, Pennsylvania, is apposite:

"It may be true that he does not receive the same amount of benefit from some or

any of these taxes as do citizens living in the heart of the city. It probably is true, from the evidence found in this record, that his tax bears a very unjust relation to the benefits received as compared with its amount. But who can adjust with precise accuracy the amount which each individual in an organized civil community shall contribute to sustain it, or can insure in this respect absolute equality of burdens, and fairness in their distribution among those who must bear them?

"We cannot say judicially that Kelly received no benefit from the city organization. These streets, if they do not penetrate his farm, lead to it. The water-works will probably reach him some day, and may be near enough to him now to serve him on some occasion. The schools may receive his children, and in this regard he can be in no worse condition that those living in the city who have no children, and yet who pay for the support of the schools. Every man in a county, a town, a city, or a State is deeply interested in the education of the children of the community, because his peace and quiet, his happiness and prosperity, are largely dependent upon the intelligence and moral training which it is the object of public schools to supply to the children of his neighbors and associates, if he has none himself."

Here, as the opinion of the court clearly demonstrates, a waterworks system is urgently necessary to protect the public health of the inhabitants of the City. Certain of Morton's employees live in the populated section of the City. Other of Morton's employees no doubt come in direct contact, from time to time, with the inhabitants of the City. Children of some of Morton's employees attend the public schools of the City. An epidemic of disease in the City would directly endanger the health of the employees of Morton who live in or mingle with the other inhabitants of the City and the children of Morton's employees who attend the public schools of the City. Such employees would come in immediate contact with other employees of Morton during working hours and subject them to the danger of infection. Hence, it seems to me that the protection and improvement of the public health of the inhabitants of the City must necessarily result in benefit to Morton.

Moreover, Morton has a substantial acreage of vacant and unimproved land lying between its plant and the improved and populated portion of the City. Unimproved lots within a city owned by non-resident persons, natural or corporate, are subject to taxes for general municipal purposes. Such property receives benefits, immediate or potential, when the general welfare within such city is promoted. Improvement of the general welfare within a city normally will make unimproved areas therein more desirable as locations for future improvements and enhance their value. The waterworks system as presently planned will extend to within 250 feet of Morton's unimproved land. Should Morton plat and improve such land or sell it to others for residential or business purposes, I entertain no doubt that lawful means will be found to make the necessary extensions of the waterworks system to such land, since the bonds will be retired from year to year and the tax values of such vacant land will increase should development and improvement thereof ensue.

Accordingly, I conclude that the construction of the waterworks system will result in benefit to Morton both immediate and potential.

Ad valorem taxes are not based on benefits but on value of taxable property. Their burdens necessarily are not in proportion to benefits and need not be to meet the constitutional test of validity. They must be uniform and must not be palpably arbitrary or discriminatory. For the reasons indicated the taxes here in question, in my opinion, meet the constitutional test of validity.