RIDGEWOOD COUNTRY CLUB, A NEW JERSEY CORPORATION, PLAINTIFF-RESPONDENT, v. BOROUGH OF PARAMUS, DEFENDANT-APPELLANT.

Argued October 7, 1969—Decided December 2, 1969.

Mr. *Seymour Cohen* argued the cause for the appellant (*Messrs. Clapp & Eisenberg,* attorneys; *Messrs. Harry Heher, Jr.* and *Jerome C. Eisenberg,* of counsel).

Mr. *Joseph Keane* argued the cause for the respondent (*Messrs. Milton, Keane & DeBona,* attorneys; *Messrs. Thomas J. Brady* and *William E. Bannon,* on the brief).

The opinion of the Court was delivered by

HANEMAN, J. This appeal concerns a special assessment levied by defendant borough upon plaintiff as a local improvement under *N. J. S. A.* 40:56–1 *et seq.,* for construction of a sewer system.

Defendant is engaged in the installation of sanitary sewer systems throughout the municipality. The project was undertaken in succeeding stages involving different sections of the borough. For a general factual discussion see *Gabriel v. Borough of Paramus,* 45 *N. J.* 381 (1965). This litigation concerns the second stage involving a section in which plaintiff is the owner of 260 acres of land used as a golf course. Although so used, the tract is placed by the zoning

ordinance in the highest residential category. The municipality directed the payment of 38% of the cost of construction be raised as a general municipal obligation and 62% by a special assessment for the benefits accruing to the property owners served by the sewer. The total amount of said special assessment may not exceed the above referred to 62%. *N. J. S. A.* 40:56–24. The reason for such allocation lay in the fact that the entire borough used and benefited by the trunk sewers, pumping stations and force mains, and the properties immediately adjacent to laterals alone used and were specially benefited by such laterals for sewage disposal. The borough constructed a trunk sewer line approximately 3,200 feet in length along plaintiff's easterly boundary. The closest building to this trunk sewer is the club house which is approximately 1,800 feet distant and has its own private sewer. Although the cost of the laying of trunk sewers was ordinarily assumed by the borough, in this instance that cost was not so to be defrayed because arrangements had been made for the special use thereof as a lateral permitting the adjacent lands to tap into the trunk for sewage transmissions. Accordingly, the cost was to be defrayed by a special assessment as if the trunk main were a lateral.

Upon the completion of the project, the sewer assessment commissioners proceeded to make assessments as provided by *N. J. S. A.* 40:56–26, 27. The method pursued was adequately and aptly described in the trial judge's opinion as follows:

"* * * the 'jumping off' point was an estimated assessment of $11.40 per front foot plus about $206.50 for the house connection from the lateral (street) sewer to the curb line. Mr. Arenander made the estimates and the Mayor and Council printed them in a written report to the taxpayers of Paramus. From the tax records, the Sewer Assessment Commissioners obtained addressographed cards for each parcel of property in Stage II, including acreage, number of plots, block and lot numbers, street or post office addresses, and the tax assessor's classification and valuation. The information, plus other information subsequently developed, was transposed to IBM punched cards, and when the latter were run through a computer, desired printouts of tabulated information were obtained. The computer

had memory — storage and retrieval capability, plus the ability to make mathematical calculations. It exercised no judgment, of course, and in no sense made the assessments. Several print-outs were obtained, and information was added and deleted until the final print-out showed three significant figures for each parcel: first, a 'sewer benefit' assessment; second, a 'connection charge'; and third, a 'total assessment.' The connection charges are not in dispute. They were assessed separately, pursuant to *N. J. S. A.* 40:56–33, and were $236.55 for a 'short' connection from the 'lateral' sewer in the center of the street to the curb line or $286.54 for a 'long' connection from the lateral to the property line. The sewer engineer supplied the figures. What is in controversy is the 'sewer benefit' assessment, which when added to the 'connection charge' resulted in the 'total assessment.'

The sewer engineer had recommended, and the Mayor and Council apportioned, the total cost of Stage II of $5,200,000., into the borough's share of $2,362,000. to be raised by general taxation and $2,838,000. to be levied as assessments for benefits. This apportionment is not disputed. The total 'connection charges' were $369,350.49 and these were deducted from the $2,838,000. leaving a balance of $2,468,649.51 to be assessed.

At this point the Sewer Assessment Commissioners arbitrarily decided upon a 'basic charge' of $100. for each of the 1,738 assessable parcels, for a total of $173,800. The significance of this 'basic charge' will hereafter become apparent, but at this point the Commissioners deducted this total from the $2,468,649.51, leaving a balance of $2,294,849.51 to be further apportioned.

Then, without any formula, or any records as to how they developed the amount, the Commissioners decided to assess acreage at $1,200. per acre and all other parcels on the basis of 'units.' They decided that a 100x125 foot lot would get 100 units, and all other lots would receive the number of units that in the 'judgment' of the Commissioners represented the 'increment in value to the property due to the sewer improvement.' Mr. Lubar, a certified public accountant, explained that no records were kept as to how the commissioners reached their decision on each piece of property. He further testified that in determining the number of units to be allocated to each lot, they took into account corner influence, unusual depth or lack of it, exceptional topographical conditions, etc.

The units, of course, really amounted to a modified front footage basis of allocation, and the $1,200. per acre figures were subsequently converted to 'units' by dividing by 10. At this point, it should be noted, the Commissioners had preliminary totals for units and dollars. There was no satisfactory explanation as to why a divisor of 10 was applied to the acreage amount, and it is readily apparent that selection of the divisor would determine the ultimate value of a unit. During this process, the Commissioners also decided that 195 lots were to receive no units at all, and would only be assessed the previously determined $100. 'basic charge': Mr. Lubar testified that

'most' of these were 'builder's lots' where subdividers during the construction of Stage II put in septic tanks as well as 'dry sewers.' When it developed that 71 of the lots in the McKinley Boulevard subdivision received no units and the builder put in no septic tanks, he explained that the builder had to build a pumping station and hook into Stage I until Stage II was completed in the area. Although he said the Commissioners determined that the cost of the septic tanks approximately equaled what the assessments would have been on the basis of units, he admitted that the Commissioners did not know the cost of the pumping station in the McKinley Boulevard area, or whether it was temporary or permanent. He testified further that in the case of all of these 195 'builder's lots' that the subdivider put in the lateral sewers (the sewers in the street upon which the houses fronted) rather than the borough, whereas in the case of the ordinary lot or homeowner, the borough put the laterals in. The Court notes that no other homeowner got credit for a septic tank, and finds as a fact that the only valid reason these 195 lots received no units, and hence no assessment except the $100. 'basic charge', is that the subdividers and not the borough constructed the lateral sewers.

At this point it was simply a matter of totalling the units and dividing into the remaining $2,294,849.51 to get the unit figure of $9.5762. The unit figure applied to the number of units allocated to a parcel, plus the 'basic charge' of $100 was the sewer benefit charge, and when the house connection charges were added where applicable, resulted in the total assessment."

Plaintiff having been assessed $154,333.52, filed an action in Lieu of Prerogative Writs contesting the validity of that assessment asserting that it received no benefit from the improvement and that even if there were a benefit, the assessment was in excess of the amount thereof. The Law Division determined that plaintiff's land could be subdivided for residential purposes, into a maximum of 150 building lots and levied the "basic charge" for "builders' lots" of $100 against each lot. Accordingly, the Law Division entered judgment for plaintiff reducing the assessment to $15,000. On appeal by the borough, the Appellate Division affirmed the Law Division judgment, substantially for the reasons set forth in the Law Division opinion. Neither opinion is reported. This Court granted defendant's petition for certification. 53 *N. J.* 353 (1969).

A number of reasons were advanced in both courts for setting aside the assessment. However, the question before

this Court relates only to the amount of plaintiff's assessment. The validity of the entire assessment is not brought into question.

Plaintiff argued, both before the Law Division and the Appellate Division, that it received no benefit whatsoever from the sewer improvement because as the operator of a golf course it had no use for a sewer system. Although this argument is not now stressed as a separate ground for affirmance of the Appellate Division, it is inextricably tied into the question of the amount of benefit which plaintiff received. Accordingly, it must be treated as a first step in the determination of the validity and propriety of plaintiff's assessment.

Plaintiff reasoned that its property was used as a golf course and since employed for this purpose could receive no benefit from an adjacent sewer. At the outset it must be recognized that an assessment may be levied only "as nearly as may be in proportion to and not in excess of the peculiar benefit, advantage or increase in value which the respective lots and parcels of real estate shall be deemed to receive by reason of such improvement." *N. J. S. A.* 40:56–27.

"Peculiar benefit, advantage or increment in value" has been defined as follows:

"Whether the property has been specially benefited by an improvement is generally regarded a question of fact, depending on the circumstances in each case, for the determination of the proper tribunal. The broad question is whether the general value of the property has been enhanced, not whether its present owner receives advantage." *In re Public Service Electric and Gas Co.*, 18 *N. J. Super.* 357 (App. Div. 1952), at 363–364.

" 'Benefit' is the increment of value to land affected by improvement. It represents the difference between the market value of the lands before the improvement and the market value of the land immediately after the improvement." (*id.*, at 365)

The fact that a landowner has no present, immediate use for the improvement is therefore immaterial, so long as the use of the improvement is accessible and available to the land sought to be assessed for any use to which the property

may legitimately be put. The ascertainment of whether a property has been benefited is not to be confined to evaluating the effect of the improvement on the particular use to which that property is being put at the time of the assessment. Rather, the test is whether its value was increased for any legitimated use to which it is or may be put. *In re Public Service Electric and Gas Co., supra.*

■ With this precept in mind, it is seen that plaintiff's land is the recipient of a benefit even though the sewer is of no advantage for present use, *i. e.,* for its golf course. There is no dispute that if used for residence purposes, a legitimate use to which the property may be put, some enhancement in value resulted. Accordingly, plaintiff received some benefit. The question then is the amount of that benefit.

■ *R. S.* 40:56–26 provides that the assessment commissioners "shall * * * make a just and equitable assessment of the benefits conferred upon any real estate by reason of such improvement having due regard to the rights and interests of all persons concerned, as well as to the value of the real estate benefited." As above noted, *R. S.* 40:56–27 provides:

"All assessments levied under this chapter for any local improvement shall in each case be as nearly as may be in proportion to and not in excess of the peculiar benefit, advantage or increase in value which the respective lots and parcels of real estate shall be deemed to receive by reason of such improvement."

The testimony disclosed that undeveloped land, in which category plaintiff's property was placed, was assessed for a $1,200 per acre benefit. This assessment thus computed amounted, as above noted, to $154,333.52. This was arrived at by a "consensus" of the Assessment Commission "after discussion with knowledgeable persons in the community." The figure had no relationship to the front foot formula (right or wrong) above described, employed for establishing the assessment for some 1,700 other properties

assessed. Nor did it take into consideration the future cost to plaintiff of laying laterals in order to connect with the present trunk. Without such laterals for transmission from residences to the trunk, the lands could receive no benefit from the improvement. Defendant argues that the "availability" of the trunk for sewer connections causes an "increase in value" of plaintiff's property and that the expense to which plaintiff or a subsequent owner may be put to obtain the use of the improvement is not an element to be considered in determining the monetary increment — that accessibility was not an essential ingredient in the computation of the dollar amount of benefit received. In effect, defendant states that the gross increase in value and not the net increase should be the basis of the assessment. The error in this conclusion lies in the fact that the "peculiar benefit" referred to in the statute is the net increment, *i. e.*, the in-pocket increase in consideration which the owner would receive from a private sale. *In re Public Service Electric and Gas Co., supra.* There is absent any proof by any qualified witness of any such net dollar enhancement in value. Accordingly, we find that the assessment was arbitrary and unreasonable.

We are not requested by plaintiff to set aside the entire assessment nor to pass upon the "builders" allowance above adverted to. All that plaintiff demands is a reduction in *its* assessment. Accordingly, we have limited the above discussion to plaintiff's assessment. We are in accord that plaintiff's original assessment should be reversed. However, we are not satisfied that the proof warrants a reduction from $154,333.52 to $15,000. We, therefore, void the original assessment and remand for the borough to take further proceedings to ascertain under the above guide, the proper amount of plaintiff's assessment, keeping in mind that it should bear the same percentage of its "net" benefit as is borne by the other properties being assessed. It is not our purpose to unalterably reverse the finding of an assessment of $15,000 but rather to reverse in order to permit de-

fendant to ascertain upon a reassessment of plaintiff's land, whether this is the proper amount. As is self-evident, the amount of any reduction in assessment must be distributed among and absorbed by all of the taxpayers of the borough, and not solely those whose lands are located in "Stage II." See *N. J. S. A.* 40:56–24 and 37. If the cost of a reassessment of plaintiff's lands may exceed the amount which could be received by such a reassessment, defendant may accept the $15,000 figure of the Law Division.

*For reversal and remandment*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.