No. 75,702

In the Matter of the Appeal of the Boeing Company from Orders of the Kansas State Board of Tax Appeals Regarding the Protests of Taxes Paid for 1991, 1992 and 1993 in Sedgwick County, Kansas.

930 P.2d 1366

Opinion filed January 24, 1997.

*Thomas R. Powell,* of Hinkle, Eberhart & Elkouri, L.L.C., of Wichita, argued the cause, and *Roger M. Theis,* of the same firm, was with him on the briefs for intervenor/appellant Oaklawn Improvement District.

*Eric F. Melgren,* of Foulston & Siefkin, of Wichita, argued the cause, and *Darrell L. Warta,* of the same firm, was with him on the brief for appellee The Boeing Company.

*Patricia J. Parker,* assistant county counselor, argued the cause, and *Stephen B. Plummer,* county counselor, was with her on the brief for appellant Board of Sedgwick County Commissioners.

The opinion of the court was delivered by

SIX, J.: This case requires our interpretation of the Improvement District Act, K.S.A. 19-2753 *et seq.* (Act). The issue arises from the language of the Act (providing for "general taxation" to pay bonds for public works projects commenced under K.S.A. 19-2765[a][9]). Does the Act authorize levying general taxes assessed on an ad valorem basis against the personal property of The Boeing Company (Boeing) to pay bonds issued for a sewer lateral reconstruction project?

Boeing paid the 1990 ad valorem taxes assessed by the Oaklawn Improvement District (Oaklawn) against Boeing's personal property in Oaklawn. Taxes for 1991 and 1992 were paid under protest. Boeing sought an injunction against Oaklawn's levy under K.S.A. 60-907. The district court granted the injunction, holding the Act unconstitutional. Oaklawn appealed. We reversed, upholding the constitutionality of the Act, and remanded with directions for dismissal, deciding that Boeing had not exhausted its remedies before the Board of Tax Appeals (BOTA). *Boeing Co. v. Oaklawn Improvement Dist.,* 255 Kan. 848, 859, 877 P.2d 967 (1994) (*Boeing I*). We said:

"The question is whether the Act's language requiring 'benefit' to property in the district and permitting 'general taxation' for a project commenced under K.S.A. 19-2765(a)(9) is authority for either general ad valorem property taxes or special assessments. We hold that such a determination is administrative in character and properly entrusted initially to BOTA." 255 Kan. at 858.

BOTA denied Boeing's protest of the 1991, 1992, and 1993 taxes. Boeing petitioned for judicial review in the district court. The district court held the taxes were unlawful, reversed BOTA, and ordered the Sedgwick County Treasurer to refund the protested taxes. Oaklawn, the Board of Sedgwick County Commissioners, and the Sedgwick County Treasurer (Sedgwick County) appealed. Our jurisdiction is under K.S.A. 20-3017 (motion of a party to transfer). We reverse the district court.

## Facts

The parties filed a written stipulation of facts with BOTA, and presented witnesses and additional evidence at the hearing. The facts as of our remand are described in *Boeing* I, 255 Kan. at 849-52. Briefly summarized, in 1989 and 1990, Oaklawn voters approved bond issues financed by ad valorem taxes on all taxable property in the district for the reconstruction of sewer laterals in a poor residential area within the district. With the approval of Oaklawn officials, Boeing built its own sewer trunk line in 1985 to service its anticipated needs for a planned development of its Oaklawn property. Although Boeing's real property was exempt, the cost of the project, through taxes assessed on its personal property, fell primarily on Boeing. Additional facts not contained in *Boeing* I and brought out at the BOTA hearing are provided below.

According to Robert Friesen, a civil engineer working for Boeing in 1983, at the time Boeing presented its planned development and its anticipated sewer requirements, Oaklawn representatives suggested that the Oaklawn system did not have the capacity to provide the service needed by Boeing. Friesen also testified that Oaklawn expressed no interest in becoming involved in building or owning the additional sewers needed by Boeing. Dan Nordmark, another Boeing engineer, recalled that Oaklawn representatives said that Oaklawn did not have the maintenance capabilities for

larger pipes needed by Boeing and expressed no interest in handling Boeing's sewage problems. Both Friesen and Nordmark said that Al Reiss, a consulting engineer for Oaklawn, was involved in the discussions of Boeing's anticipated sewer needs. Boeing believed it had no alternative but to build its own sewer system.

Reiss, however, did not recall that Boeing ever brought up either hooking into the Oaklawn system permanently or Oaklawn building and operating the line for Boeing.

Robert Lakin, a former Wichita-Sedgwick County Metropolitan Area Planning Director and a Boeing witness, testified that traditionally, sewer laterals are always financed by the property they serve, or can serve (if the property is a vacant lot). A sewer lateral is an underground pipe picking up sewage from individual homes on both sides of the pipe. A sewer main picks up sewage from the laterals and conveys it toward a treatment facility or to a larger pipe, an interceptor. An interceptor, sometimes called a trunk line, carries the sewage to the treatment facility. Laterals carry sewage from the local neighborhood. Mains and interceptors benefit more than just adjacent properties and are traditionally financed over a larger area. Benefit areas for trunk lines are established by engineering studies and normally consist of a drainage basin or sub-basin. Property not served by a sewer can still benefit, because of the opportunity to hook into it. However, a lateral could benefit only the adjacent property. Lakin compared the benefit analysis for financing sewers to that used for water lines or streets. Lakin agreed that Oaklawn's sewer system would have been inadequate to serve Boeing's anticipated needs and expressed concerns about Oaklawn's ability to manage such a project.

Lakin had never seen an instance in which a lateral sewer project was financed with a levy on personal property. However, Lakin believed improvement districts have authority to issue general obligation bonds payable by ad valorem taxes. Lakin had seen instances when improvement districts issued general obligation bonds financed with ad valorem taxes for such projects as water towers or swimming pools. Lakin acknowledged that repairs to laterals were paid for out of a sewer utility fund from sewer service charges levied on all users. In Lakin's experience, projects for ex-

tension of laterals in the City of Wichita were always specially assessed, unless the developer had already installed them. However, Lakin could not recall an instance when reconstruction of a sewer was financed by a special assessment. He acknowledged that the City of Wichita uses revenue bonds funded by sewer service charges to pay for the reconstruction of laterals.

Al Reiss, the Oaklawn engineer, described the poor condition of the original clay pipe laterals. The pipe joints leaked. The bedding for the pipes was sand, below the water table in certain places. Groundwater could seep into the pipe through a joint, causing a cavity around the pipe. The laterals were laid in the streets, instead of in alleys. When cavities developed around pipe joints, streets above could collapse and pipes could break, resulting in frequent expensive repairs. When a line broke, sand sucked into the open pipe could block the line and cause sewage backup into homes. Leaking pipes below the water table could become surcharged with underground water, resulting in sewage escaping from manholes. Also, sewage leaking from pipes could pollute the surrounding water table. Storm water could get into the system, causing surface sewage.

The lateral reconstruction project did not involve removing old laterals and replacing them with new ones. Plastic "Instiuform" liners were forced through the existing pipes with water pressure. A heat and chemical process hardened the liners to become an inner shell inside the pipes. The lateral reconstruction essentially eliminated the surcharging problems, cutting costs and reducing sewage volume by almost half. The public health threat from surface sewage and groundwater pollution was also eliminated. Street repair costs were reduced. Solving the groundwater infiltration problem increased the capacity of the system.

Reiss opined that Oaklawn could not have financed the lateral reconstruction project with revenue bonds because the bonds would not have sold. Oaklawn is a poor neighborhood and could not generate sufficient revenue to make the bonds marketable. A local real estate appraiser's testimony showed that the lateral reconstruction project could not have been financed with special assessments on the properties served by the laterals because K.S.A.

19-2769 limited assessments to 10 percent of the value of the properties assessed.

Boeing's share of the total assessments for 1993, all against Boeing's personal property, reached 81.1%. Boeing's real estate was exempt, due to industrial revenue bonds. As those exemptions expire over the next few years, Boeing's percentage of total Oaklawn taxes paid for the sewer lateral reconstruction will increase to 90% or more. Boeing can expect to pay 70-90% of the total principal and interest payments of approximately $4.1 million over the 20-year payout on the bonds that financed the project.

## BOTA's Order

BOTA agreed with Oaklawn's interpretation of the Act and found that Oaklawn had the authority to levy general taxes against Boeing's personal property. BOTA reasoned that under K.S.A. 19-2765(a)(9), Oaklawn had the authority to issue bonds to pay for public works such as sewer improvements. Under K.S.A. 19-2767, Oaklawn had authority to pay for the cost of the bonds by general levy, special assessments, or revenue bonds. Also, the power to issue bonds and repay them by general levy is included under K.S.A. 19-2765(a)(15). BOTA also found that Boeing received indirect benefits from the sewer project, although Boeing does not use the system. The project was undertaken "because of the general threat to public health due to the present state of the sewer system and the potential of damage to other public works such as streets and property." BOTA concluded:

"While the Board feels that Oaklawn was less than fair and very heavy handed in assessing Boeing for these sewer improvements, nevertheless it is legally correct to do so. . . . Boeing is part of the Oaklawn Improvement District and is therefore subject to a general tax levied by the improvement district to retire bonds that were used to pay for public improvements."

## The District Court's Reversal

Boeing sought judicial review in the district court. Oaklawn intervened. Sedgwick County also appeared, its interest being that if the levy were to be declared illegal and a refund ordered, the County Treasurer's obligation should be limited to undistributed tax money collected for the Oaklawn Bond and Interest Fund. The

district court adopted the findings of fact and conclusions of law submitted by Boeing, reversed BOTA's order, and ordered that the protested taxes be refunded in full. The Sedgwick County Treasurer was directed "to forthwith pay such refund to Boeing out of all tax moneys he has collected but not distributed, and thereafter charge such payment against the appropriate Oaklawn fund."

The district court based its reversal of BOTA's decision on K.S.A. 77-621(c)(3) (agency has not decided an issue requiring resolution, *i.e.*, BOTA failed to determine whether the project benefitted Boeing's property) and (4) (erroneous interpretation of the law by an agency, *i.e.*, BOTA misinterpreted the Act).

## DISCUSSION

Boeing argues that BOTA characterized the issue incorrectly, contending that the issue was whether Oaklawn's sewer lateral reconstruction project provided any "benefit" to Boeing's assessed properties, as that term is used in the Act. Instead, BOTA addressed the question whether Oaklawn had the statutory authority to levy a general tax to finance the bonds in question. Boeing claims that BOTA should have considered only whether the project in question provided any direct, special benefit to Boeing's properties and not whether indirect benefits accrued.

Boeing's argument begs the question. The issue necessarily involves determination of whether the project in question provided any "benefit" to Boeing's assessed properties, as that term in used in K.S.A. 19-2765(a)(9). In turn, the meaning of the term "benefit" must be determined. Is it limited only to direct or special benefits, as Boeing contends, or are general, indirect benefits sufficient to satisfy the statutory requirement, as Oaklawn contends? We agree with Oaklawn.

Interpretation of a statute is a question of law. Our review is unlimited. *In re Appeal of Topeka SMSA Ltd. Partnership*, 260 Kan. 154, Syl. ¶ 2, 917 P.2d 827 (1996). BOTA orders are subject to judicial review under the Act for Judicial Review and Civil Enforcement of Agency Actions, K.S.A. 77-601 *et seq*. We apply the same standards that the district courts apply in reviewing agency

actions. *Peck v. University Residence Committee of Kansas State Univ.*, 248 Kan. 450, Syl. ¶ 3, 807 P.2d 652 (1991).

Oaklawn argues that the district court ignored the doctrine of operative construction, as stated in *Hixon v. Lario Enterprises, Inc.*, 257 Kan. 377, 379, 892 P.2d 507 (1995). We have said that BOTA is a specialized agency that exists to decide taxation issues. BOTA's decisions should be given great credence and deference when it is acting in its area of expertise. However, if we find that BOTA's interpretation is erroneous as a matter of law, we should take corrective steps. Here, Boeing challenges the validity of BOTA's order and bears the burden of proving the order's invalidity. K.S.A. 77-621(a)(1); *Hixon*, 257 Kan. 377, Syl. ¶ 1.

Our task is statutory construction. The fundamental rule is that the intent of the legislature governs. We first look to the words used. When a statute is plain and unambiguous, we must give effect to the expressed statutory language, rather than determine what the law should or should not be. Words in common usage should be given their natural and ordinary meaning. We view the entire act and have a duty as far as practicable, to reconcile the different provisions to make them consistent, harmonious, and sensible. *Davis v. City of Leawood*, 257 Kan. 512, 517-18, 893 P.2d 233 (1995).

## The Statutes Involved

The relevant authorization provisions of the Act are: K.S.A. 19-2765(a)(7)(i) (annual levy of 5 mills on all taxable tangible property to create a general fund); K.S.A. 19-2765(a)(8) (levy of assessments and special taxes); K.S.A. 19-2765(a)(9) (issuance of bonds to pay for constructing public works and improvements); K.S.A. 19-2765(a)(15) (all other acts necessary to carry out granted powers); K.S.A. 19-2767 (three different means of paying for public works bonds: general levy, special taxes or assessments, or revenue bonds); K.S.A. 19-2768 (election to approve issuance of bonds to be paid by general taxation); K.S.A. 19-2769 (levy of special taxes or assessments upon benefitted real estate); K.S.A. 19-2770 (the option to issue improvement bonds paid by installments of special taxes or assessments, instead of a one-time assessment).

### General Taxes Versus Assessments for Local Improvements

"A distinction exists between general taxes and assessments for special or local improvements. The former are exactions placed upon the citizens by the taxing authorities for the support of the government while the latter are imposed upon property within a limited area for payment of special or local improvements." *Mount Hope Cemetery Co. v. City of Topeka*, 190 Kan. 702, Syl. ¶ 2, 378 P.2d 30 (1963) (cemetery held exempt from assessment for general taxation purposes but not exempt from assessment for special or local improvements, a street paving project).

General taxes are commonly levied on an ad valorem (according to value) basis. *Sossoman v. Board of County Comm'rs*, 230 Kan. 210, 213, 630 P.2d 1154 (1981).

"The foundation of the power to make a special assessment for a local improvement of any character, including the construction of a sanitary sewer system, is that the property against which the assessment is levied derives some special benefit from the improvement." *Mullins v. City of El Dorado*, 200 Kan. 336, 341, 436 P.2d 837 (1968).

### Boeing's Interpretation of the Act

Boeing argues that Oaklawn's taxing powers are limited to those expressly set forth in K.S.A. 19-2765(a), the 5-mill general tax levy for the general fund in (a)(7)(i) and the special assessments levy in (a)(8). The power to issue bonds granted under K.S.A. 19-2765(a)(9) does not imply the power to pay for those bonds with a general tax levy when the improvement does not benefit all property in the district.

In Boeing's view, the tax in question did not benefit Boeing's assessed personal property for three reasons: (1) The reconstructed laterals do not serve Boeing's properties, which are served by a separate system; (2) the reconstructed laterals only serve and benefit properties next to those laterals; and (3) all of Boeing's assessed property was personal property, which legally cannot support an assessment for sewer improvements.

According to Boeing, the terms "general levy" or "general taxation," as used in the statutes, should not be given the specific

meaning that Oaklawn attaches to them, *i.e.*, ad valorem taxes levied against all taxable property in the district. K.S.A. 19-2767 and -2768 are merely procedural. The three methods set forth in K.S.A. 19-2767 for payment of improvement bonds (general taxation, special assessment, or revenue) only refer to how the tax is to be levied—not to what it may be levied against. Boeing contends that K.S.A. 19-2765(a) limits the property to be taxed to that property directly benefitted by the public.improvement.

Although Boeing does not argue that Oaklawn is limited to using only special assessments to pay for lateral reconstruction, it contends that if Oaklawn chose to finance the project with general taxes, those taxes should be assessed only against benefitted real estate and not against personal property, which received no direct benefit.

Boeing argues that indirect benefits alone are not enough. Boeing attempts to distinguish *Morton Salt Co. v. City of South Hutchinson*, 159 F.2d 897 (10th Cir. 1947), and *Morton Salt Co. v. City of South Hutchinson*, 177 F.2d 889 (10th Cir. 1949), noting that the statutory provisions at issue in those cases (authorizing a municipality to impose taxes to finance construction of a waterworks system) did not require that the assessed property benefit from the improvement, as K.S.A. 19-2765(a)(9) does. Boeing also points out that the constitutionality of the tax was at issue in the *Morton Salt Co.* cases, whereas the present case involves the determination whether the statute requires that taxed properties receive direct benefits from the project.

### Oaklawn's Interpretation of the Act

Oaklawn argues that K.S.A. 19-2767 and -2768 empower a general tax levy to pay for improvement bonds issued under K.S.A. 19-2765(a)(9) and approved by the voters. K.S.A. 19-2767 gives the improvement district's board of directors the power to decide what public works projects need to be undertaken. The directors may decide whether the public works are to be paid for with bonds and, if so, the method of bond payment: general levy, special assessments, or revenue bonds. K.S.A. 19-2768 imposes a limitation, re-

quiring electorate approval for bonds to be paid by general taxes. The bonds in question were lawfully approved by the voters.

Oaklawn points out that under Boeing's and the district court's interpretation, K.S.A. 19-2765(a)(9), -2767 and -2768 (all relating to general tax-financed improvement bonds) become surplusage. Also, the provision in K.S.A. 19-2765(a)(9) limiting the amount of the bonds to 25% of the assessed valuation of the district (including both real and personal property), shows legislative intent to use the term "benefit" in the general, indirect sense, granting improvement districts the power to finance improvement bonds with general taxes if all property generally benefits.

Oaklawn disagrees with the district court's interpretation that Oaklawn may not assess property to pay for an improvement unless the assessed property derives special benefit from the improvement, arguing that such an interpretation is contrary to the plain language of the statute. If 19-2765(a)(9) grants the power to issue bonds, then (a)(15) (granting powers necessary to execute other enumerated powers) must grant the power to determine a method to pay those bonds.

Oaklawn argues the district court's reasoning that Oaklawn's sole power to levy general taxes is set forth in K.S.A. 19-2765(a)(7)(i) is not correct, observing that 19-2765(a)(7)(i) only authorizes taxation for a general maintenance fund. The power to levy a general assessment to pay electorate-approved bonds under K.S.A. 19-2765(a)(9), -2767, and -2768 is separate and in addition to the power to levy general taxes for the general fund under 19-2765(a)(7)(i). K.S.A. 19-2767 and -2768 show legislative intent that taxpayers can be generally taxed for sewer reconstruction needed to eliminate widespread problems.

According to Oaklawn, even if the power to levy general taxes to pay improvement bonds was not expressly provided for in the statute, it is there by implication. Oaklawn contends that if K.S.A. 19-2765(a)(9) authorizes the issuance of bonds to pay for a public project, then the power to levy taxes to pay for those bonds should also exist.

Oaklawn emphasizes that a bond paid with special assessments does not have to be approved by the voters, K.S.A. 19-2769, 19-

2770, whereas a bond funded by general taxes must be voter-approved, K.S.A. 19-2768. The voter approval requirement shows legislative intent that power to levy general taxes to pay for improvement bonds exists.

Oaklawn argues the term "benefit" in K.S.A. 19-2765(a)(9) should be used in the indirect sense. Oaklawn looks to *U.S.D. No. 229 v. State*, 256 Kan. 232, 271-72, 885 P.2d 1170 (1994); *Board of County Comm'rs v. Robb*, 166 Kan. 122, 199 P.2d 530 (1948); *Morton Salt Co.*, 159 F.2d at 900-01; and *Morton Salt Co.*, 177 F.2d at 891-92, as support for its position that Boeing's property received indirect benefits from the lateral reconstruction project, *i.e.*, the increased capacity to handle future sewage, budget savings in maintenance and sewage treatment costs, and elimination of the public health threat. Because a general tax is one levied without regard to special benefit, bonds funded by general taxes need not show direct benefit to Boeing's property, if indirect benefit is present.

In K.S.A. 19-2765(a)(8), the legislature expressly linked the benefit from a special assessment project to real estate, whereas in 19-2765(a)(9), the legislature linked the benefit to "all property." According to Oaklawn, this shows legislative intent that the term "benefit" in 19-2765(a)(9) includes indirect benefit, because personal property, unlike real estate, does not receive any direct benefit from public improvements. Oaklawn reasons that such a construction is more harmonious than Boeing's interpretation that only direct benefit was intended.

## Analysis

In *Morton Salt Co.*, 159 F.2d 897, Morton sought injunctive relief to enjoin the City of South Hutchinson from selling bonds for the construction of a waterworks system. The complaint alleged that Morton would be required to pay 46% of the cost of the improvements, based on the assessed valuation of Morton's property, but would receive no benefit from the project because after completion, the closest water pipe to Morton's property would still be ¾ mile away. A city election had approved the bond issue for the waterworks project for South Hutchinson to be assessed pro rata

on all property within the city. Morton complained that the city's action was arbitrary, an abuse of power, contrary to equal protection of the law, and a taking without due process. The federal district court denied injunctive relief, but the Court of Appeals reversed and imposed a preliminary injunction against the sale of the bonds, pending a full hearing on the constitutional claims. 159 F.2d at 902. The court noted an earlier case from this court, *Lewis v. City of South Hutchinson*, 162 Kan. 104, 174 P.2d 51 (1946), that upheld the same bond issue against a challenge of abuse of power and fraudulent and ultra vires acts. However, the *Morton Salt Co.* court noted that *Lewis* did not address any constitutional claims. 159 F.2d at 900. After remand and a full hearing, the district court again denied relief, and the Court of Appeals affirmed, deciding that Morton received enough direct and indirect benefits from the proposed waterworks project for the assessment to withstand constitutional attack. 177 F.2d at 892. Morton had opted not to be included in the area reached by the waterworks. The potential existed for the waterworks to be extended to Morton later. The waterworks was needed because of the number of polluted wells in the city.

Although *Morton Salt Co.* has similarities to this case, there are factual differences. Boeing built its own sewer system for its expansion project when it learned of the lack of excess capacity in Oaklawn's sewer system, claiming it had no alternative. Boeing did not challenge the bond issue for the sewer lateral reconstruction project, which involved a local area within Oaklawn. *Morton Salt Co.* involved a new waterworks project for an entire city. Boeing will end up paying for 70 to 90% of the lateral reconstruction project. Morton was to be assessed for 46% percent of the cost of the bonds. Boeing's protest involves a statutory construction issue about whether the project in question benefits all property in the district, as required in K.S.A. 19-2765(a)(9). The benefit analysis in *Morton Salt Co.* was for constitutionality purposes. However, the discussion of direct versus indirect benefits in *Morton Salt Co.* is applicable.

We agree with the general rule that assessments for a local improvement may only be made against the property specially ben-

efitted by those improvements. However, Boeing's direct benefit argument assumes that the improvement project is one to be paid for with special assessments. The initial question is whether the project must be financed with special assessments.

Boeing's interpretation of K.S.A. 19-2767 and 17-2765(a) would create a new hybrid of ad valorem tax: one levied only against the assessed value of property found to directly benefit from the improvement (as opposed to a general levy against the assessed value of all taxable property in the district).

McQuillin defines "public improvements" as follows: "Public improvements may be either local or general in nature. Local improvements are those made in a particular locality which result in special benefit of the real property adjoining or nearby, whereas general improvements are those of general use or benefit." 13 McQuillin, Municipal Corporations § 37.01, p. 9 (3d ed. rev. 1987). A sewer is a local improvement. *Maywood Co. et al. v. Village of Maywood*, 140 Ill. 216, 221, 29 N.E. 704 (1892).

However, 14 McQuillin, Municipal Corporations § 38.25 (3d ed. rev. 1987) provides: "Although there may be special statutory authorization, under the usual grant of power, special assessments cannot be levied to pay for reconstructing or repairing a sewer, even though additional benefits accrue." The "no special assessment for reconstruction or repairs" rule derives from early Pennsylvania cases. See *West Third Street Sewer*, 187 Pa. 565, 41 A. 476 (1898); *Hinaman et al. v. Vandergrift*, 197 Pa. Super. 140, 177 A.2d 174 (1962); see also *City of Erie v. Russell*, 148 Pa. 384, 387, 23 A. 1102 (1892) ("[The sewer, once built,] is now a constituent of the general system ordained by the city for the convenience and health of its inhabitants. This system confers benefits which are general; it is a public necessity, and the expense of maintaining it should be provided for by general taxation.").

However, there is contrary authority. See 63 C.J.S., Municipal Corporations § 1318 c.

Boeing cites special assessment law treatises for the proposition that property served by one sewer system cannot be taxed for the construction of another sewer system duplicating that service (14

McQuillin, Municipal Corporations §§ 38.24, 38.34, 38.59; 64 C.J.S., Municipal Corporations § 1993, p. 679). However, 14 McQuillin, Municipal Corporations § 38.25a, p. 116 provides: "If a sewer is necessary, the fact that certain property is adequately drained by private sewers or ravines does not prevent its being assessed for such sewer." 14 McQuillin, Municipal Corporations § 38.59 further provides: "The fact that the landowner has constructed a private sewer does not relieve him from the assessment [for construction of a sewer]." See *City of Atchison v. Price*, 45 Kan. 296, 314, 25 Pac. 605 (1891) (taxpayers challenging special assessment for city sewer construction were held liable for assessments, despite fact that they had built private sewers at their own expense; city had not approved or adopted the private sewers); *Northern Pacific Terminal Co. v. City of Portland*, 80 F.2d 738, 743 (9th Cir. 1935) (fact that a railroad terminal company had constructed a private sewer system adequate for its needs was held not to preclude assessment of the property, based on benefits received, for construction of the city sewage system).

Boeing relies on cases applying special assessment rules stated in McQuillin, such as *Bell v. City of Topeka*, 220 Kan. 405, 553 P.2d 331 (1976); *Dodson v. City of Ulysses*, 219 Kan. 418, 549 P.2d 430 (1976); *Mullins v. City of El Dorado*, 200 Kan. 336; and *Whitehead v. City of Fredonia*, 9 Kan. App. 2d 90, 673 P.2d 125 (1983), *aff'd* 235 Kan. 321, 680 P.2d 286 (1984). All involved special assessment challenges for new construction projects, not reconstruction projects. None considered whether the project should have been funded with special assessments as opposed to general taxes or another financing mechanism. These cases, which dealt only with the mechanics of the special assessment process, are not persuasive in the resolution of this case.

Boeing directs us to *Ridgewood Country Club v. Borough of Paramus*, 55 N.J. 62, 68-69, 259 A.2d 218 (1969) for the proposition that only properties adjacent to a sewer lateral are specially benefitted. *Ridgewood* is distinguishable from the Oaklawn reconstruction. The taxpayer in *Ridgewood* challenged the amount of its special assessment for a sewer construction project near its prop-

erty. *Ridgewood* did not involve reconstruction of existing laterals, funded by voter-approved bonds financed by general taxes.

Boeing cites *Johnson County Comm'rs v. Robb*, 161 Kan. 683, 171 P.2d 784 (1946), as authority that ad valorem taxation is merely a tax procedure. *Robb*, another special assessment case involving new sewer construction, concerned the constitutionality of the subject statute, not the statutory meaning of the term "benefit." Because the statute provided for assessment against real estate and did not authorize personal property assessment, the state auditor claimed it violated the uniformity provision in Article 11, § 1 of the Kansas Constitution. We decided that the assessments were not general taxes and not subject to that constitutional provision because they were to pay for new sewer construction benefitting real estate and not to be used for general public purposes. 161 Kan. at 691-92. *Robb* extends support to Oaklawn's position. The Oaklawn tax is an ad valorem tax against all real and personal property in the district (excluding Boeing's exempt real property). The tax revenues are to pay bonds for reconstruction of existing laterals, not installation of a new sewer. Therefore, the Oaklawn tax, as distinguished from the tax in *Robb*, need not be characterized as a special assessment.

*Sossoman v. Board of County Comm'rs*, 230 Kan. 210, another case relied upon by Boeing, involved an unsuccessful taxpayers' challenge to a special assessment for construction of a new sewer treatment facility. We followed the same interpretation applied in *Robb*, 161 Kan. 683, holding that the tax was in reality a special assessment and not subject to the constitutional uniformity provision. *Sossoman*, 230 Kan. at 215.

Boeing notes the well-known rule that special assessments can only be levied against real estate and not against personal property (citing 14 McQuillin, Municipal Corporations § 38.30 and 64 C.J.S., Municipal Corporations § 1979, p. 648). That rule might be applicable if this case involved special assessments for the extension of a new sewer lateral system. However, reconstruction or replacement of badly deteriorated laterals within Oaklawn, despite where they were located, has some indirect benefit to all property in Oaklawn by protecting the integrity of the entire sewer system.

Boeing's assertion that the terms "general levy" and "general taxation" appearing in K.S.A. 19-2767 and -2768 should not mean ad valorem taxes levied against all taxable property in the district overlooks the specific meaning of those terms. See *Sossoman*, 230 Kan. at 213; *Mount Hope Cemetery Co. v. City of Topeka*, 190 Kan. 702, Syl. ¶ 2.

Boeing's argument that Oaklawn's taxing powers are limited to those expressly set forth at K.S.A. 19-2765(a) ignores the other statutory provisions. K.S.A. 19-2765(a)(9) authorizes an improvement district to issue bonds to fund an improvement that benefits all property in the district. Those bonds must be paid. K.S.A. 19-2765(a)(15) grants powers not otherwise enumerated that are necessary to execute the enumerated powers. K.S.A. 19-2767 and -2768 expressly provide for the issuance of bonds funded by general tax levies after electorate approval.

The statutes in question grant authority to fund public works projects through any of three methods: special assessments, general taxes, or revenues (such as a sewer service charge). They do not limit an improvement district to the special assessment method.

Although Boeing claims it had no alternative, Boeing may have unilaterally decided to build its own sewer system (now owned and maintained by the City of Wichita) after learning that Oaklawn's system would be insufficient to service Boeing's anticipated needs. Boeing's witnesses stated that Oaklawn had no interest in providing for Boeing's anticipated sewer needs, but they could not name any specific Oaklawn official as stating that position. Reiss, the consulting engineer for Oaklawn, did not recall that Boeing ever asked whether Oaklawn could build or upgrade its system to meet Boeing's anticipated needs. There is no evidence that Boeing obtained any agreement from Oaklawn not to levy taxes on it in the future when Boeing undertook to build its own sewer.

To be certain, the direct benefits of this project to Boeing's property appear nonexistent, and any indirect benefits are slight compared to the taxes assessed against Boeing. The surface sewage and collapsed streets from deteriorating laterals were not in Boeing's vicinity. Boeing's property is separated from the original Oaklawn residential area by Highway K-15, a railroad, and undeveloped real

estate. However, Reiss˙testified that a sewage overflow incident occurred at 47th Street before the lateral reconstruction project. To the extent that 47th Street, a major arterial street, serves Boeing's property, Boeing could receive some benefit from reconstruction of the laterals in the 47th Street area. The entire district benefits, to some extent, from reduced maintenance costs for the streets and sewers resulting from the project. K.S.A. 19-2765(a)(9) does not specify how much benefit must be received. We hold that Boeing's personal property received indirect benefits from the project.

Oaklawn can be criticized for the manner in which it funded reconstruction of the laterals. The fact that Boeing will end up paying 70-90% of the cost of the project is harsh. However, our task in judicially reviewing this matter is not to criticize the wisdom of Oaklawn's actions—if they are not illegal. As the current Chief Justice said for the court in another sewer case:

"The issues raised in this case basically involve raw power—the power of the board . . . to act and the power of the legislature to enact the statute in question. Neither the wisdom of the legislature's enactment of the statute nor the wisdom of the defendant board's utilization of it are legitimate subjects for judicial review. The court can certainly understand the plaintiffs' concern over the major escalation in their tax burden arising from the [project], particularly in view of some of the aggravating factors shown to exist. However, no legal justification for the [relief] has been established." *Sossoman*, 230 Kan. at 216.

Something had to be done with the laterals. Oaklawn pursued a funding option available under the Act.

### Tax Refund Issue

BOTA's interpretation of the Act is correct. Consequently, we need not address the refund issue.

The judgment of the district court is reversed.