(16 P.3d 981)
No. 84,510

IN THE MATTER OF THE EQUALIZATION APPEALS OF TOTAL PETROLEUM, INC., FOR THE TAX YEAR 1997 FROM COWLEY COUNTY, KANSAS.

Opinion filed December 15, 2000.

*Benjamin J. Neill*, of Neill, Terrill & Embree, Inc., of Overland Park, for appellant.

*Richard D. Greene*, of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, for appellee Total Petroleum, Inc.

Before BEIER, P.J., ELLIOTT, J., and JANICE D. RUSSELL, District Judge, assigned.

BEIER, J.: Cowley County (County) appeals the district court's ruling affirming the Kansas Board of Tax Appeals' decision that a closed oil refinery is realty rather than personal property. We affirm.

Appellee-taxpayer Total Petroleum, Inc., (Total) shut down its oil refinery in Arkansas City and removed certain key components necessary to run it. Total did not intend to reopen the refinery, although it continued to run a small asphalt storage operation on the premises.

While the refinery was still operating, the County appraised it, using a guide prepared by the Property Valuation Division (PVD) of the Kansas Department of Revenue. The guide allocated 90 percent of the calculated value of the refinery to real estate, approximately $19.1 million, and 10 percent to personal property, approximately $2 million.

After the refinery closed, the County's appraiser testified that use of the PVD guide for valuation was no longer appropriate. Appellant categorized the remaining refinery property other than the land itself as personal property and valued it at $12.6 million, based on a third-party's purchase offer, which was ultimately rescinded. Two parcels of land underlying the property were separately appraised as real property at $422,890 and $1,026,860.

Total appealed this valuation to the Board of Tax Appeals (BOTA), arguing that the County had improperly divided the refinery assets into personalty and realty and that the property had a negative value because of environmental remediation costs.

At the BOTA hearing, the County presented expert testimony that the value of the remaining property was $9,944,640. However, on cross-examination, the County's expert admitted he arrived at the figure by using the amount of the rescinded offer to purchase. He also admitted he was not a licensed appraiser and had no experience in valuing oil refineries.

Total presented the testimony of three witnesses who addressed the salvage value of the remaining property. Total's corporate property tax manager testified that the net book value of the fixed assets at the refinery location was $1,596,699. The national director of the complex property tax group for Ernst & Young, LLP, opined the value of the property was $3,260,000, based on data obtained concerning the sale of a comparable refinery one year earlier. Total's operations manager, Harold Green, testified that he believed the remaining refinery property would be worth $2.5 million to $3 million if cut down and sold for scrap.

Green also testified regarding the physical characteristics of the improvements, including how the tanks and operating units were originally constructed, attached, and interconnected. Green explained that the tanks were constructed using sheet metal, which was welded to the ground, and that their side walls were put up one sheet at a time until each was 3 inches thick. Green also testified that the tanks were not portable, were never moved, and would have to be cut down a piece at a time to be hauled away.

Green also testified about the construction of the towers at the refinery:

"The towers, they usually railed them in because they were too long to come in by truck. One that comes to mind was about 120 feet tall, weighed 175,000 pounds. That's empty weight without the trays. It has got the trays in it about every 18 inches. They go down about 20 feet and start pouring a big base of foundation with rebar and then come up to pedestals. The pedestals has got usually an inch and a half anchor bolts. You take—after you get the tower set, leveled, it's grouted in, usually an epoxy grout which is real hard to remove. It's supposed to withstand a windload of a hundred mile an hour."

Green also said that, when certain components were removed earlier, it had taken two crews 4 weeks to obtain two items, a reactor and a heater.

An environmental engineer for Total's successor company also testified. He said the amount of the reserve the company maintained to cover the cost of cleaning up environmental contamination at the refinery was more than $21.7 million over a 10-year period. The remediation would include, among other things, asbestos removal, cleaning, and disposal of hazardous sludge.

The County did not take issue with any of Green's testimony about the size and weight of the property or about the difficulty of removing it from the land. It merely emphasized that the property *could* be removed.

BOTA made the following findings in concluding that the appraised value of the subject property for the tax year at issue was $0:

"First, the Board finds that the County erroneously reclassified the fixtures of the refinery to personal property. Nearly all improvements to real property may be salvaged to a certain extent. A house may be uninhabitable, but still have salvage value in the wood and fixtures. Merely because a fixture is no longer useable for its intended purpose, but may have some salvage value, does not warrant classifying the fixture as personal property. Second, the Board finds that the County failed to make any attempt to value the subject property according to accepted appraisal standard. The County did attempt to support its recommended value, after the fact, through the testimony of Ronald Cook. However, Mr. Cook did not apply any recognized appraisal method in his review of the subject property, but also used the 'offer' as the basis for arriving at his value. Essentially, Mr. Cook arrived at a salvage value of $9,460,632. It is further noted that Mr. Cook is not a licensed appraiser and has no experience in valuing oil refineries as his area of expertise is limited to the valuation of oil and gas leases. The Board finds that Mr. Cook's estimate of salvage value is still far less than the cost to cure the environmental problems associated with the land and the fixtures."

The County appealed BOTA's decision to the district court. The district judge affirmed, finding BOTA's decision that the property constituted fixtures, *i.e.*, part of the realty, was supported by substantial evidence and was not unreasonable, arbitrary, or capricious. The court also concluded it was proper for BOTA to offset any positive salvage value of the fixtures by any negative value of

the land itself, including the environmental liability associated with the land and the cost of remediation. See K.S.A. 1999 Supp. 79-412 ("It shall be the duty of the county or district appraiser to value the land and improvements; but the value of the land and improvements shall be entered on the assessment roll in a single aggregate."); see also *In re Tax Appeal of Andrews*, 18 Kan. App. 2d 311, 323, 851 P.2d 1027 (1993) (holding the aggregate value of the land and its improvements is the controlling value).

This appeal by the County focuses only on the finding that the remaining refinery property was realty rather than personal property.

Our standard of review requires us to recognize that BOTA specializes in deciding taxation issues and that courts generally give its decisions deference on such issues unless its interpretation is erroneous as a matter of law. *In re Tax Appeal of Boeing Co.*, 261 Kan. 508, 515, 930 P.2d 1366 (1997).

"When reviewing an agency's action, an appellate court's scope of review is limited to determining whether the district court reviewed the action in accordance with the Act for Judicial Review and Civil Enforcement of Agency Actions, K.S.A. 77-601 *et seq. Board of Douglas County Comm'rs v. Cashatt*, 23 Kan. App. 2d 532, 538, 933 P.2d 167 (1997).

"K.S.A. 77-621(c) allows the court to grant relief from the agency action under certain circumstances, including when the agency erroneously interpreted or applied the law, when the agency's decision is not supported by substantial competent evidence in the record, or when the agency's action is unreasonable, arbitrary, or capricious. K.S.A. 77-621(c)(4),(7), and (8). The party who asserts that the agency's decision is invalid bears the burden of proving the invalidity. K.S.A. 77-621(a)(1)." *In re Equalization Appeal of Ottawa Housing Assoc., L.P.*, 27 Kan. App. 2d 1008, 1009-10, 10 P.3d 777 (2000).

K.S.A. 79-102 provides that the terms "real property," "real estate," and "land" "shall include not only the land itself, but all buildings, fixtures, improvements . . . and . . . rights and privileges appertaining thereto."

In Kansas, the test for determining whether personal property becomes a fixture is: "(1) annexation to the realty; (2) adaptation to the use of that part of the realty with which it is attached; and (3) the intention of the party making the annexation." *Stalcup v.*

*Detrich,* 27 Kan. App. 2d 880, 10 P. 3d 3 (2000) (citing *U.S.D. No. 464 v. Porter,* 234 Kan. 690, 695, 676 P.2d 84 [1984]).

In *Stalcup,* this court found that a metal building attached by metal bolts to a concrete slab was personal property because (a) it could be removed, (b) it was not particularly adapted to the farmland on which it sat, and (c) the owners' intention at the time of annexation for it to remain personal property was borne out by their provisions that it be separately taxed and that the taxes be paid by a distinct party. 27 Kan. App. 2d at 886-87. In *Porter,* the court noted that the propane tank at issue was not attached to the soil, was not buried underground, and was easily movable. It finally concluded that the tank was personal property. 234 Kan. at 695.

"Most modern authorities recognize the practical difficulties in formulating a comprehensive principle for determining what are fixtures, and hold that the determination can only be made from a consideration of all the individual facts and circumstances attending the particular case. [Citation omitted.]" *Kansas City Millwright Co., Inc. v. Kalb,* 221 Kan. 658, 664, 562 P.2d 65, *modified* 221 Kan. 752, 564 P.2d 1280 (1977). In this case, substantial competent evidence supports the district court's finding that the remaining refinery property should be classified as fixtures rather than personalty.

First, with regard to annexation, Green testified that the refinery property was firmly attached to the land and not easily removable, unlike the tank in *Porter.* The refinery tanks involved here are so large that the sheet metal to make them had to be transported to the site on semi trucks. It was welded down to create the floor of the tank, and the sides sheets were welded together until they formed a wall three inches thick. In order to remove the tanks, Green testified, they would have to be cut down a piece at a time. The refinery towers, weighing as much as 175,000 pounds, were built 20 feet into the ground with concrete foundations and designed to withstand 100-mile-an-hour winds. All of the property was originally interconnected, and it had not been severed from the land on the day of valuation. These facts constitute substantial competent evidence that the property was annexed to the realty.

In terms of adaptation, the County argues the property ceased to be of any value or usefulness to the land when the refinery closed down. However, a small part of the property was still being used on the valuation date to store asphalt. In addition, evidence was presented that the land was devoted to the placement of an oil refinery; and some of the property, including the towers and tanks, was specifically constructed for placement on that particular land. Much of the property would have to be cut down in pieces in order to be removed from the land, and such removal would result in environmental contamination that would have to be treated. This evidence was sufficient to meet the adaptation part of the test for fixtures.

Finally, with regard to intention, the County asserts Total intended that all of the property become personal property when the refinery was permanently closed. That is not the period of time we examine to determine this question. *At the time of annexation,* the taxpayer clearly intended that the property would be a permanent part of the land. It was firmly affixed to the ground, and the property was interconnected in such a way that removal of any portion would be exceedingly laborious and complicated. Moreover, the fact that the property still was not severed from the land on the date of valuation provides another piece of substantial competent evidence that the taxpayer's intention at the time of annexation was the creation of fixtures, not personal property.

Our review of the facts and the governing law in this case persuades us that BOTA did not erroneously interpret or apply the law; that its decision was supported by substantial competent evidence; and that its action was not unreasonable, arbitrary, or capricious.

Affirmed.