In re FARMLAND INDUSTRIES, INC., et al., Debtors.

Farmland Industries, Inc., Plaintiff,

v.

Alliance Process Partners, LLC, et al., Defendants.

Bankruptcy No. 02–50557–JWV.
Adversary No. 03–04057–JWV.

United States Bankruptcy Court, W.D. Missouri.

Sept. 5, 2003.

Cassandra L. Writz, Cynthia Dillard Parres, William Jeffrey Maloney, Michelle M. Masoner, Robert M. Thompson, Tammee E. McVey, Bryan Cave LLP, Frank W. Lipsman, Morton, Hubbard, Ruzicka & Kreamer, Olathe, KS, Gene A. DeLeve, Berman, Deleve, Kuchan & Chapman, Laurence M. Frazen, Mark G. Stingley, Kansas City, MO, Michael D. Hockley, Spencer, Fane, Britt & Browne, Kansas City, MO, Thomas R. Graham, King & Spalding LLP, Washington, DC, for Debtor/Plaintiff.

Jerry L. Phillips, Paula C. Acconcia, Office of the U.S. Trustee, Bruce E. Strauss, Thomas N. Lane, Merrick Baker Strauss, Kansas City, MO, Robert S. Blanc, Houston, TX, Thomas M. Franklin, Kansas City, MO, Thomas J. O'Neal, Shughart, Thomson & Kilroy, Springfield, MO, Erlene W. Krigel, Krigel & Krigel, P.C., Kansas City, MO, for Interested Parties.

G. Edgar James, G. William Quatman, Shughart, Thomson & Kilroy, Kansas City, MO, Michael Hayes Freeman, Tulsa, OK, Roger H. Templin, Overland Park, KS, Ronald S. Weiss, David A. Kraft, Berman, DeLeve, Kuchan & Chapman, Kansas City, MO, Joanne B. Stutz, Evans & Mullinix, P.A., Shawnee, KS, John M. Hickey, Barber & Bartz, Tulsa, OK, Glenn M.

Reisman, Shelton, CT, David E. Shay, Kansas City, MO, Wesley F. Smith, Stumbo, Hanson & Hendricks, Topeka, KS, Bruce E. Strauss, Merrick Baker Strauss, Kansas City, MO, B. Scott Tschudy, Overland Park, KS, R. Andrew Battmer, Kurlbaum Stoll Seaman, Kansas City, MO, Kurt F. Kluin, Kluin & Bolt, Chanute, KS, Rick E. Frawley, Kutak Rock LLP, Amy E. Bauman, Stueve Helder Siegel, Norman E. Siegel, Stueve Helder & Siegel, David A. Schatz, Levy & Craig, James F. Freeman, III, Moore Hennessy & Freeman, Kansas City, MO, Doneen Douglas Jones, Fellers, Snider, Blankenship et al., Oklahoma City, OK, Robert E. Massengill, Cohen, McNeile, Pappas & Shuttleworth, Leawood, KS, Samuel P. Logan, Foulston Siefkin, Overland Park, KS, Jerald S. Enslein, Gallas & Schultz, Kansas City, MO, Joseph H. Pedigo, Bellaire, TX, Clifton K. Molatore, O'Melveny & Myers, Los Angeles, CA, for Defendants/Counter–Claimants.

## MEMORANDUM OPINION AND ORDER [1]

JERRY VENTERS, Bankruptcy Judge.

The Court takes up for ruling the cross-motions for partial summary judgment filed by Farmland Industries, Inc., ("Debtor") and Defendant Alliance Process Partners, LLC, d/b/a International Alliance Group ("Alliance").[2] The singular issue before the Court at this time is whether certain property at the Debtor's refinery in Coffeyville, Kansas, is real or personal property for purposes of artisan's liens asserted by Alliance.

The artisan's liens claimed by Alliance are among more than seventy liens that are at issue in this Adversary Proceeding. The Debtor has asked the Court to determine the validity and priority of some seventy-four mechanic's liens filed with respect to the refinery property, as well as determining the validity and priority of the three artisan's liens asserted by Alliance. Of the claimants involved in this Adversary Proceeding, Alliance is the only claimant that has asserted an artisan's lien with respect to the refinery property.

On June 26, 2003, Alliance filed a motion for partial summary judgment (Document # 250) requesting an Order from this Court declaring that the property subject to its liens is personal property. On July 18, 2003, the Debtor filed a cross-motion for partial summary judgment (Document # 260) seeking a declaration that the equipment described in Alliance's artisan's liens is a part of the real property. The motions were properly supported by affidavits and documentary evidence. Each party opposed the other's motion.[3] The parties presented oral arguments on this issue on July 29, 2003, and the Court is now prepared to rule.

## I. STANDARD OF REVIEW

Summary judgment is appropriate when the matters presented to the Court "show that there is no genuine issue as to any material fact and that the moving party is

---

1. This Memorandum Opinion and Order constitutes the Court's conclusions of law pursuant to Fed. R. Bankr.P. 7056. This is a core proceeding arising under 28 U.S.C. § 157(b)(2)(K). This Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 157(a) and 1334.

2. The Debtors in the jointly administered Chapter 11 proceeding are Farmland Industries, Inc., Farmland Foods, Inc., Farmland Pipe Line Company, Farmland Transportation, and SFA, Inc. However, Farmland Industries, Inc., is the sole Plaintiff in this Adversary Proceeding.

3. Cust–O–Fab Field Service Co. and its affiliated companies ("Cust–O–Fab"), which are among the Defendants, also filed an opposition to Alliance's motion. (Document # 264)

entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); Fed. R. Bankr.P. 7056; *Celotex v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265, 273 (1986). The party moving for summary judgment has the initial burden of proving that there is no genuine issue as to any material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 161, 90 S.Ct. 1598, 1611, 26 L.Ed.2d 142 (1970). Once the moving party has met this initial burden of proof, the non-moving party must set forth specific facts sufficient to raise a genuine issue for trial, and may not rest on its pleadings or mere assertions of disputed facts to defeat the motion. *Matsushita Electric Industrial Co., Ltd., v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (stating that the party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts"). The mere existence of a scintilla of evidence in support of the opposing party's position will not be sufficient to forestall summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In ruling on a motion for summary judgment, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. 2505.

## II. BACKGROUND

The Debtor owns and operates a nitrogen fertilizer plant and oil refinery in Coffeyville, Kansas. In the early 1940s the Debtor installed a Fluid Catalytic Cracking Unit ("FCC Unit") for the purpose of upgrading gas and oil feedstock to higher value products. The useful life of this unit ended in the late 1970s, and in 1980 the Debtor replaced the old FCC Unit with a new one. In 2001, the FCC Unit was in need of repairs and upgrades[4] and the Debtor contacted Reliant Energy Solutions, LLC ("Reliant") to obtain financing for the project. The agreement with Reliant was a financing lease whereby Reliant would become the owner of the newly installed parts, and if the Debtor defaulted under the agreement, then Reliant could seize those parts. For various reasons, the financing lease agreement with Reliant was terminated and the Debtor contracted directly with Alliance to supply the parts and perform the necessary work to upgrade the FCC unit. After the Debtor failed to pay its invoices, Alliance filed personal property liens against the FCC Unit with the register of deeds in Montgomery County, Kansas.[5]

---

4. Upgrading the FCC Unit was part of a larger "turnaround" project at the Coffeyville facility.

5. Alliance asserts a priority right to the FCC Unit under Kansas's artisan's lien statute, which provides:

> Whenever any person ... shall perform work, make repairs or improvements or replace, add or install equipment on any ... personal property ... equipment of all kinds ... a first and prior lien on such personal property is hereby created in favor of such person performing such work ....

Kan. Stat. § 58–201.

The Debtor has stated that the amount of Alliance's claim is $4,790,410.20, which reflects a $500,000.00 offset in compensation for contract damages. Cust–O–Fab Field Service, another construction company that performed work at the Coffeyville refinery, has asserted that the total lien claims against the refinery exceed $26,000,000.

Cust–O–Fab, in its opposition to Alliance's motion, asserts that, if the Court determines that the FCC Unit is personal property, Alliance will have achieved a first lien position against those who asserted mechanic's and materialmen's liens against the Coffeyville refinery at large. On the other hand, if Alliance is found to not have the artisan's liens it claims, Alliance will become an unsecured creditor.

The largest parts of the FCC Unit—occupying approximately 56,000 square feet of the refinery—are the regenerator and reactor vessels, which are attached to a 135–foot tall steel frame. The regenerator head is welded to the regenerator vessel, and regenerator cyclones hang from the regenerator head inside the vessel. The reactor is perched above the regenerator, and the two parts are connected by piping. The metal structure fencing in the regenerator and reactor vessels is connected to a concrete foundation by bolts. The entire structure was designed to withstand not only the dead load, but also a strong wind load and vibrations. When Alliance removed the old regenerator head in 2001, it was able to do so because the regenerator head was designed with lifting lugs for attaching crane cables. The mere delivery, set-up and use of the crane to replace the regenerator head in 2001 cost the Debtor approximately $520,000.00. While it would be possible to remove the FCC Unit, such removal would require cutting the FCC Unit into pieces for later reassembly. Without the FCC Unit, unsaleable portions of crude could not be upgraded into finished transportation fuels and the Coffeyville refinery would merely become a topping operation.

Used FCC Units are sold by dealers to other refineries in the United States and around the world. The FCC Unit at the Coffeyville refinery has a remaining useful life of approximately fifteen to twenty years. After Alliance performed the repairs and upgrades in 2001, the Debtor stated that its intention was to use the unit for the remainder of its useful life. In November 2001, the Debtor's accountant executed a personal property/service sales tax exemption certificate on the FCC Unit, informing the Kansas Department of Revenue that it was exempt from the state sales tax because it met the statutory requirement of being machinery or equipment forming an essential part of an integrated production operation of a manufacturing processing plant. Likewise, in the schedules filed in this Chapter 11 bankruptcy proceeding, the Debtor lists as personal property some equipment that is identical to that installed by Alliance. Also in 2000, 2001, and 2002, the Montgomery County Appraiser's Office classified the Debtor's refinery plant and equipment as tangible personal property. At the same time, however, the Debtor classified ninety percent of the Coffeyville refinery as real property and only ten percent as personal property in its Montgomery County Commercial Property Tax Return.

## III. DISCUSSION

As previously stated, the issue before the Court is whether the property against which Alliance has asserted artisan's liens is personal property or real property. The determination of whether equipment is personal property or real property "can only be made from a consideration of all the individual facts and circumstances attending the particular case." *Kansas City Millwright Co., Inc. v. Kalb,* 221 Kan. 658, 562 P.2d 65, 70 (1977) (citing 35 Am.Jur.2d, Fixtures, § 1, p. 700). For tax purposes, the Kansas legislature defines "real property" as including not only the land itself, but also all buildings, fixtures, and improvements. Kan. Stat. § 79–102. Concordant with the tax definition of real property, personal property is defined "as every tangible thing which is the subject of ownership, not forming part or parcel of real property...." § 79–102. Kansas courts have long recognized the difficulty in separating real from personal property, particularly in regard to fixtures. *Atchison, Topeka & Santa Fe Railroad Co. v. Morgan,* 42 Kan. 23, 21 P. 809, 811 (1889) (stating that "[i]t is frequently a

difficult and vexatious question to ascertain the dividing line between real and personal property, and to decide upon which side of the line certain property belongs."). To help determine whether personal property has become a fixture and thus a part of the real estate, the Kansas Supreme Court has developed a three-part test:

1. Is the property annexed to the realty?

2. Is the property adapted to the use of that part of the realty with which it is attached?

3. What is the intention of the party making the annexation?

*Board of Education, Unified School District No. 464 v. Porter,* 234 Kan. 690, 676 P.2d 84, 89 (1984); *Winslow v. Bromich,* 54 Kan. 300, 38 P. 275, 277 (1894); *Stalcup v. Detrich,* 27 Kan.App.2d 880, 10 P.3d 3, 8 (2000). All three of these requirements must be met before it can be said that personal property has become a fixture. *Morgan,* 21 P. at 812 ("It has been held that, before personal property can become a fixture by actual physical annexation, the intention of the parties and the uses for which the personal property is to be put *must all combine* to change its nature from that of the chattel to that of the fixture.") (emphasis added).

### 1. Annexation to the Realty

■ "Annexation" is the union of property with a freehold. *Webster's Third New International Dictionary* 87 (1981). The weight of the property and the structure needed to support it are not necessarily determinative of whether the property is real or personal. *Porter,* 676 P.2d at 89 (finding that a liquid propane tank weighing twelve to fourteen tons and supported by four-foot concrete piers was personal property). Property required to be assembled on site, built into the ground, and

moveable only at considerable expense may be deemed annexed to the realty. *In re Equalization Appeals of Total Petroleum, Inc. for Tax Year 1997 from Cowley County, Kansas [Total Petroleum],* 28 Kan.App.2d 295, 16 P.3d 981, 985–86 (2000) (holding that refinery property encased in sheet metal three inches thick, weighing as much as 175,000 pounds, interconnected with other property, and supported by towers built twenty feet into the ground with concrete foundations built to withstand 100 mph winds was annexed to the realty). Annexation may also depend on whether the property is readily replaced. *Gafford Lumber & Grain Co. v. Eaves,* 114 Kan.576, 220 P.512, 514 (1923) (citing *Ford v. Cobb,* 20 N.Y. 344 (1859), for the proposition that salt kettles embedded in brick arches were personal property when they could be removed by displacing a portion of brick at an inconsiderable expense and when the manufacturer required that the kettles be removed and reset annually). Items not actually or constructively annexed to the land and not intended to enhance the value of the property are not fixtures. *Winslow,* 38 P. at 278 (declaring that moveable sugar wagons used in a mill were personal property not enhancing the value of the realty).

■ Alliance argues that Kansas law requires an intent to make a piece of equipment a "permanent annexation" to the freehold before the equipment can become real property. *Dodge City Water & Light Co. v. Alfalfa Irrigation & Land Co.,* 64 Kan. 247, 67 P. 462, 464 (1902). The Debtor's Fed.R.Civ.P. 30(b)(6) representative testified that he thought "permanent" meant "forever," and the FCC Unit was not "permanent" because it had a finite useful life. In the context of a real property discussion, however, "permanent" does not mean "forever;" rather, "permanent" means "fixed or intended to be

fixed." *Webster's Third New International Dictionary* 1683 (1981). Consonant with Webster's definition, Black's Law Dictionary defines real property, in part, as "[l]and; that which is affixed to land; that which is incidental or appurtenant to land; that which is immovable by law." *Black's Law Dictionary* 1218 (6th ed., West 1990). Nothing in use will wear forever. *The Rappahannock*, 184 F. 291, 294 (2nd Cir.1911). Buildings, and the fixtures within them, do not last "forever," yet Kansas courts recognize the general rule that a building is normally considered part of the real estate. *Stalcup v. Detrich*, 27 Kan.App.2d 880, 10 P.3d 3, 8 (2000); *American States Insurance Co. v. Powers*, 262 F.Supp.2d 1245 (D.Kan.2003). "Permanent annexation" is a matter of degree subject to judicial discretion based on the facts and circumstances of a particular case. *Kansas City Millwright Co., Inc. v. Kalb*, 221 Kan. 658, 562 P.2d 65, 70 (1977).

 In this case, the FCC Unit does not function in isolation.[6] It is interconnected with other parts of the Coffeyville refinery. The original FCC Unit at the Coffeyville Refinery was installed in the early 1940s and was not replaced until 1980. The principal parts of the FCC Unit—occupying approximately 56,000 square feet of the refinery—are suspended from steel framing reaching approximately 138 feet above ground. The steel framing is connected to concrete foundations by bolts and was built to withstand the dead load, a strong wind load, and vibrations. The mere delivery, set-up, and use of a crane to replace the regenerator head alone in 2001 cost the Debtor $520,000.00. When Alliance installed the regenerator head in 2001, it arrived in six pieces which were welded together on-site. To disassemble the FCC Unit, Alliance would be required to open the metal structure which encases the FCC Unit, disassemble the principal parts, move the heaviest parts by crane onto trucks for transport, and carefully match-mark the unit for later reassembly. Based on these facts, the Court finds that the FCC Unit is annexed to the realty because it is of considerable size and weight; it is encased in steel framing which is securely fastened to the land; it is moveable only at considerable expense and effort; moving the FCC Unit would require disassembly; and although the FCC Unit could be replaced, such an event only occurs every thirty-five to forty years.

### 2. Adapted to the Use of that Part of the Realty to which it is Attached

 Evidence that land was used for a particular purpose—and that the property in question was used to further that purpose—is sufficient to show that the attached property is adapted to the use of the realty. *Total Petroleum*, 16 P.3d at

---

**6.** Alliance argues that the Court should not consider any other part of the Coffeyville refinery because only the FCC Unit is subject to its lien. Thus, Alliance asserts that the metal structure encasing the FCC Unit, the concrete foundation, and any other appurtenant property is irrelevant to determining whether the FCC Unit is real or personal property. The Court rejects this argument. Contrary to Alliance's contentions, the FCC Unit does not operate in isolation. It requires a large support structure and access connections for products to ingress and egress. An alleged fixture's connection with the land is essential in determining whether it is real or personal property. *See Minnesota Co. v. St. Paul Co.*, 69 U.S. (2 Wall.) 609, 17 L.Ed. 886 (1864) (Nelson, Clifford, and Field dissenting) (stating that an object's "connection with the land is looked at principally for the purpose of ascertaining whether [the] intent was that the thing in question should retain its original chattel character, or whether it was designed to make it a permanent accession to the lands."). The need to consider the property as a whole is implicitly recognized in Kansas's three-part test.

985 (finding the adaptation element was met when a part of the property was still in use, the land was devoted to the placement of an oil refinery, some of the property was specifically constructed for placement on the land, to remove the property would require cutting it in pieces, and removal would result in environmental contamination). *Cf. Stalcup,* 10 P.3d at 8 (holding that a metal building did not appear to be particularly adapted to the use of the farm on which it sat because the particular type of building was found on farms all across the state). *See also Porter,* 676 P.2d at 89 (distinguishing *Jackson v. State of New York,* 213 N.Y. 34, 106 N.E. 758 (1914), on the basis that the machinery in question in *Jackson* was specially adapted to the particular manufacturing process; thus, it was adapted to the use of the realty).

 Here, the Debtor used the land for the purpose of operating an oil refinery and for manufacturing nitrogen fertilizer. The FCC Unit directly furthered the Debtor's refinery operation by upgrading "gas oil" to higher value products. Removal of the FCC Unit would reduce the refinery to a topping operation resulting in a failure to upgrade otherwise unsaleable portions of crude oil to finished transportation fuels. Also, to support the FCC Unit, the Debtor was required to build a massive structure that extended at least 135 feet above ground. Based on these facts, the Court finds that the FCC Unit is adapted to that part of the realty to which it is attached because it directly furthered the purpose for which the Debtor used the land; and the Debtor provided a specifically built structure to meet the needs of the geographical location and to house the FCC Unit.[7] Conversely, the FCC Unit would have no independent useful purpose if it were not part of a refinery.

### 3. The Debtor's Intention in Annexing the FCC Unit

 Even though a structure is annexed to the realty, the intention of the annexor may take precedence in determining that the structure is personal property. *Stalcup,* 10 P.3d at 8 (finding the parties intended a building to be personal property when there was an oral agreement that the building was to remain personal property, the building and land were taxed separately, and when separate funds were used in the building's construction, to pay taxes, and to pay insurance). For example, trees—which are both annexed and adapted to the realty—are real property when they are grown in an orchard, but they are personal property if grown in a nursery. *Morgan,* 21 P. at 812 (Kan.1889) (holding that a pump and boiler installed by a railroad company were personal property because they were not intended to benefit the land and were merely used to operate the railroad). A party's intention is determined at the time the property is annexed to the land. *Total Petroleum,* 16 P.3d at 985.

 In this case, both parties presented evidence of the Debtor's treatment of

---

**7.** Alliance asserts the FCC Unit is not adapted to the realty to which it is attached because the FCC unit is moveable and a secondary market exists for such units. Alliance likened the FCC Unit to a hot water heater. *See First Federal Savings & Loan Association of Okaloosa County v. Stovall,* 289 So.2d 32 (Fla. App.1974) (finding a hot water heater was personal property); *contra, Ver Plank v. Bouwens,* 6 Misc.2d 965, 164 N.Y.S.2d 596, 598 (N.Y.Civ.Ct.1957) (finding a hot water heater part of the real property). It is possible to move all things. The mere fact that a secondary market exists for removed property is not determinative of whether the property as annexed to the land is adapted to the use of the realty.

the FCC Unit in 2001. Alliance advanced several arguments in support of its position. It asserts that the FCC Unit has a resale value on a secondary market and that it has a finite useful life; thus, it was not intended to be part of the realty because it needed periodic replacement. Additionally, the Debtor treated the FCC Unit as personal property when it negotiated a financing lease with Reliant to pay for Alliance's repairs and upgrades. Under that agreement, Reliant, as the lessor, would have had the ability to seize the parts that were ultimately installed by Alliance. Also, in November 2001, the Debtor classified the FCC Unit as exempt from personal property/service sales taxes. Furthermore, in 2000, 2001, and 2002, the Montgomery County Appraiser's Office classified the Debtor's Coffeyville refinery as personal property. Finally, in the Debtor's personal property schedules, it lists as personal property some equipment that is identical to that installed by Alliance. This objective evidence, Alliance argues, demonstrates that the Debtor never intended the FCC Unit to become part of its real property.

The Debtor, on the other hand, argues that an FCC Unit formed part of its integrated facility from the early 1940s, and at the time the current FCC Unit was installed in 1980, the Debtor intended to use the unit for the rest of its useful life. While the FCC Unit would not last "forever," it was affixed to the realty in a massive support structure and it was not readily moveable. Also, the Debtor classified ninety percent of its facility as real property and only ten percent as personal property in its Montgomery County Commercial Property Tax Return. Regarding the

proposed financing lease with Reliant, the Debtor asserted that the lease was terminated,[8] that it ended up contracting directly with Alliance, and that the proper time frame for determining intent would be the early 1940s when the original FCC Unit was installed, or in 1980 when the unit was replaced. As for the Montgomery County Appraiser's Office classification of the refinery as personal property, the Debtor asserted that the tax rate was the same for both real and personal property so there would have been no point in contesting the classification. Finally, the Debtor asserts that it is inequitable to look at its bankruptcy schedules to make a determination that the FCC Unit is personal property because those schedules were prepared in a short amount of time by attorneys who were not previously affiliated with the Debtor.

As this recitation of the conflicting evidence amply demonstrates, a genuine issue of material fact exists concerning the intentions of the Debtor in annexing the FCC Unit to the Coffeyville refinery. Because the Court may not consider the credibility or the weight of the evidence in deciding a motion for summary judgment, this matter will be set for an evidentiary hearing for a determination of the Debtor's intentions with respect to the annexation of the FCC Unit.

## IV. ORDER

Therefore, it is

**ORDERED** that Defendant, International Alliance Group's Motion for Partial Summary Judgment is DENIED. It is

**FURTHER ORDERED** that Plaintiff, Farmland Industries's Cross–Motion for

---

8. The Debtor asserted that the proposed financing lease with Reliant was terminated because Reliant's right to "repossess" the FCC unit was a right without a remedy considering that the financing lease only covered the parts installed by Alliance, and in isolation those parts were useless.

Partial Summary Judgment is GRANTED IN PART as follows:

A. The FCC Unit is annexed to the realty.

B. The FCC Unit is adapted to the use of the realty with which it is annexed.

In all other respects, Plaintiff's Cross–Motion for Summary Judgment is DE-NIED. It is

**FURTHER ORDERED** that this matter will be set for an evidentiary hearing for a determination of the Debtor's intentions with respect to the annexation of the FCC Unit.